**TWISTER B.V., Appellant,**

v.

**NEWTON RESEARCH PARTNERS, LP, Appellee.**

No. 05–11–00409–CV.

Court of Appeals of Texas, Dallas.

April 11, 2012.

Jennifer Heather Davidow, Phillip B. Dye, Jr., Vinson & Elkins, LLP, Houston, Tyler J. Bexley, Vinson & Elkins, LLP, Dallas, for Appellant.

Jim L. Flegle, Carol E. Farquhar, Corey Weinstein, Loewinsohn Flegle Deary, L.L.P., Dallas, for Appellee.

Before Justices O'NEILL, FRANCIS, and MURPHY.

## OPINION

Opinion By Justice MURPHY.

Twister B.V. appeals the trial court's order denying its special appearance in a theft of trade secrets suit filed against it by Newton Research Partners, LP. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(7) (West 2008) (interlocutory appeal). We affirm.

## BACKGROUND

Both Twister and Newton are involved in the business of natural gas processing. Twister is a Dutch private limited liability company located in the Netherlands town of Rijswijk. Twister was formed in 2001 by Shell International Exploration and Production B.V., a company of the Royal Dutch/Shell Group of Companies and an investment partner to "market innovative gas processing technologies to the global exploration and production market." One of Twister's products is a supersonic separator, which separates hydrocarbon liquids and water from natural gas. Twister's gas-processing technology was developed by Shell International and transferred to Twister at the time of its incorporation. A Shell International employee involved in the development of the technology, Cornelis Antonie "Kees" Tjeenk Willink, became Twister's Chief Executive Officer.

Newton, a Texas limited partnership, owns what it claims are confidential and proprietary trade secrets related to natural gas processing. The alleged trade secrets were developed by Michael Bloom and concerned technology used to separate and remove contaminants from natural gas. For descriptive purposes only, this information is referenced simply as the "trade secrets." Bloom was a limited partner in Newton and manager of Newton's general partner, Newton Research, LLC. Newton obtained ownership of the trade secrets through a series of assignments and agreements.

In 1997, Bloom disclosed the trade secrets to Shell E & P Technology Corporation, a division of Shell Exploration & Production Company, under a promise of confidentiality. According to Newton, Shell Exploration later violated that promise and shared the trade secrets with a Shell affiliate in the Netherlands and others, including Twister. Newton claims Twister then unlawfully used Newton's trade secrets in Twister's gas-separation products and that Twister marketed and sold those products in Texas and elsewhere.

Newton filed suit against Twister and other defendants[1] in 2007, charging them with, among other things, stealing New-

---

1. In addition to Twister, Newton sued Shell Exploration, Shell Oil Company, Shell Technology Ventures, Inc., and Shell International Exploration and Production, Inc. None of these defendants is a party to this appeal, and to simplify our exposition, we generally ignore the additional defendants.

ton's trade secrets and violating the Texas Theft Liability Act. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 134.002(2), 134.003(a) (West 2011) (providing for civil liability for certain acts proscribed by the penal code, including theft of trade secrets). Newton also charged Shell Exploration with breaking contractual promises of confidentiality and breaching its fiduciary duty to Newton by unlawfully misappropriating Newton's trade secrets.

In response, Twister filed a special appearance with a supporting affidavit from Tjeenk Willink, who at that time was Twister's CEO and Chief Technology Officer. Tjeenk Willink stated in his affidavit that the technology used in Twister's gas-separation products was not derived from Newton's trade secrets; rather, it was based on technology developed by another company. Newton's response to Twister's special appearance included an affidavit from Bloom, as well as other documentary evidence. Bloom stated that after reviewing certain documents related to Twister's technology and products, he concluded the technology he developed and disclosed to Shell Exploration was being used by Twister in its products. Newton's other evidence related to Twister's marketing and product sales in Texas. Twister later filed an amended special appearance with a supplemental affidavit from Tjeenk Willink in which he explained the extent of Twister's marketing and sales projects in Texas.

The trial court heard argument on the special appearance in October 2008. The parties relied on their documents on file and offered no live testimony; thus, the record consists of the affidavits and other documents attached to the special appearance and response. The trial court did not rule on Twister's special appearance at this hearing or at a second special appearance hearing held one year after the first.[2] Nearly a year and a half later, in March 2011, the trial court orally denied Twister's special appearance at a hearing on a motion to modify a prior discovery order. The trial court subsequently signed its order denying Twister's first amended special appearance on March 30, 2011. The trial court did not specify the basis for its ruling in the order and did not issue fact-findings or legal conclusions.

## DISCUSSION

Twister asserts in its sole issue on appeal that it is not subject to personal jurisdiction in Texas and the trial court therefore erred in denying its special appearance. The question of whether a trial court has personal jurisdiction over a nonresident defendant is one of law that we review de novo. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010). When, as here, the trial court does not issue findings of fact or conclusions of law in support of its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex.2007); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex.2002). When the appellate record includes the clerk's and reporter's records, the trial court's implied findings are not conclusive and may be challenged for legal and factual sufficiency on appeal. *BMC Software*, 83 S.W.3d at 795. In a legal sufficiency review, the challenge fails if more than a scintilla of

---

2. The second special appearance hearing involved Twister's special appearance against two entities that intervened in the suit. The Intervenors adopted Newton's claims against Twister and the other defendants but also asserted claims against Newton and Bloom. The Intervenors later withdrew from the suit before the trial court ruled on the special appearance.

evidence supports the factual finding. *Id.* We review de novo a trial court's legal conclusions. *Id.* at 794.

### Personal Jurisdiction Requirements

■ Texas courts may exercise personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute permits the exercise of jurisdiction and (2) the assertion of jurisdiction is consistent with federal and state constitutional due process guarantees. *Kelly,* 301 S.W.3d at 657. The requirements of the Texas long-arm statute are considered satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *Id.* Thus, in practice, the two conditions are conflated into one requirement of due process. *See Spir Star AG v. Kimich,* 310 S.W.3d 868, 872 (Tex.2010); *Delta Brands, Inc. v. Rautaruukki Steel,* 118 S.W.3d 506, 510 (Tex.App.-Dallas 2003, pet. denied).

■ Personal jurisdiction over a nonresident defendant is consistent with due process guarantees when the defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with " 'traditional notions of fair play and substantial justice.' " *Moki Mac,* 221 S.W.3d at 575 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Minimum contacts are established when the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). The defendant's conduct and connection with the state must be such that it could reasonably anticipate being sued in the forum. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75, 105 S.Ct. 2174,

85 L.Ed.2d 528 (1985); *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002) ("The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court.").

■ A defendant's contacts with a forum can give rise to either general or specific jurisdiction. *BMC Software,* 83 S.W.3d at 795–96. General jurisdiction exists when a defendant's contacts with the forum are continuous and systematic, regardless of whether the defendant's alleged liability arises from those contacts. *Goodyear Dunlop Tires Operations, S.A. v. Brown,* — U.S. ——, ——, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011); *Moki Mac,* 221 S.W.3d at 575. Specific jurisdiction is established if the defendant's alleged liability arises from or relates to the defendant's contacts with the state. *See Spir Star AG,* 310 S.W.3d at 873. A court may exercise specific jurisdiction over a nonresident defendant when two requirements are met: (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to those contacts. *Id.; Moki Mac,* 221 S.W.3d at 576.

■ Even if minimum contacts are present, a trial court may not exercise personal jurisdiction over a nonresident defendant if it would offend traditional notions of fair play and substantial justice. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cnty.,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal Exch. Assurance,*

*Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 231 (Tex.1991).

## Burdens of Proof

■■■■ Procedurally, the parties to a personal jurisdiction challenge bear shifting burdens of proof. *Kelly,* 301 S.W.3d at 658. The plaintiff bears the initial burden of pleading jurisdictional facts sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Id.* If the nonresident defendant challenges jurisdiction through a special appearance, it then bears the burden of negating all bases of personal jurisdiction alleged by the plaintiff. *Id.; Moki Mac,* 221 S.W.3d at 574. The nonresident defendant "can negate jurisdiction on either a factual or legal basis." *Kelly,* 301 S.W.3d at 659. Jurisdiction can be negated on a legal basis if the defendant can establish that taking the plaintiff's alleged facts as true, (1) "the evidence is legally insufficient to establish jurisdiction"; (2) "the defendant's contacts with Texas fall short of purposeful availment"; (3) for specific jurisdiction, "the claims do not arise from the contacts"; or (4) "traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id.*

## Analysis

We begin with the question of whether the trial court has specific jurisdiction over Twister, because our conclusion from that analysis disposes of this appeal. Twister has simplified our jurisdictional analysis by conceding the first requirement for specific jurisdiction—that is, Twister admits its contacts with Texas were purposeful. It argues, however, specific jurisdiction does not exist as a matter of law because Newton's claims against Twister do not arise from or relate to Twister's Texas contacts.

■■■■ The "arises from or relates to" requirement defines the required connec-

tion among the defendant, the litigation, and the forum. *Moki Mac,* 221 S.W.3d at 584. In assessing the strength of the necessary connection, the Texas Supreme Court has held that "for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Id.* at 585. To identify the operative facts of the litigation, we look to those facts that would be the focus of the trial. *See id.; see also Pulmosan Safety Equip. Corp. v. Lamb,* 273 S.W.3d 829, 839 (Tex.App.-Houston [14th Dist.] 2008, pet. denied).

### Newton's Jurisdictional Allegations

Newton asserts the trial court has specific personal jurisdiction over Twister because Twister marketed and sold products containing Newton's trade secrets in Texas. Specifically, Newton pleaded the following jurisdictional facts:

> The causes of action against [Twister] herein arose from or are connected with [Twister's] contacts with the State of Texas because (1) upon information and belief, [Twister] offers for sale and sells its products, including gas separation products, in the State of Texas, which products contain the Newton technology at issue in this case; (2) [Twister] was and is associated with a business enterprise and has conducted or participated in the operation of the affairs of that enterprise as such affairs pertain to this action; and (3) [Twister] has directed communications to persons and entities in Texas regarding the Newton technology at issue in this action.
>
> . . .
>
> [Twister] has directed marketing efforts in Texas in the hope of soliciting sales of products containing the Newton technology at issue in this case. [Twister's]

liability to Newton arises from or relates to such business in Texas, in significant part. Twister entered contracts with Texas residents to market products containing the Newton technology at issue in this case. [Twister] employees have travelled to Texas to market products containing the Newton technology at issue in this case.

Newton also alleged Twister had been engaged in longstanding business in Texas, marketed in Texas, performed services in Texas, and maintained an office in Texas. These factual allegations serve as a basis for Newton's claims against Twister for misappropriation of trade secrets, violation of the Texas Theft Liability Act, aiding and abetting one or more defendants by "assisting or encouraging," and aiding and abetting one or more defendants by "assisting and participating." Newton also alleged Twister acted with the other defendants as a single business enterprise.

### Twister's Texas Contacts

The affidavits and other documents submitted to the trial court support Newton's jurisdictional allegations—that Twister's Texas contacts concerned its marketing and sales efforts related to its gas-separation products. The fact of these contacts is undisputed; at the first special appearance hearing, Twister stipulated that it marketed its products in Texas. Twister's Texas contacts include working with Texas-based companies to market Twister's products, sales or pursuit of potential sales in Texas, and entering into confidentiality agreements with multiple Texas companies to discuss Twister's technology with potential customers. Twister employees also have traveled to Texas to discuss Twister's technology with Texas representatives of various companies. And Twister employees have exhibited Twister's products and presented technical papers concerning Twister's gas-separation technology at trade conferences in Texas. According to Tjeenk Willink, the purpose of Twister's attendance at those trade conferences was "to market Twister's products and services for projects all over the world, not just in Texas." At one time, Twister's sales director had a Houston cell phone number.

Twister also explored business-opportunity projects in Texas. For example, Twister investigated an opportunity to install a Twister demonstration unit at a gas-processing facility in Corpus Christi. In addition, Twister entered into an agreement with a Midland company to identify potential applications of Twister's technology within that company's product portfolio and potential opportunities for Twister's system.

### Relatedness of Twister Contacts to Newton's Claims

■ Twister contends that even assuming Newton's allegations are true—that Twister's products contain Newton's trade secrets—Twister's marketing and sales activities in Texas have no jurisdictional relevance because Newton's claims for misappropriation of trade secrets and civil theft are unrelated to those contacts. As a threshold matter, questions of specific jurisdiction are decided on a claim-by-claim basis when a plaintiff's claims arise out of different forum contacts of the defendant. *See, e.g., Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir.2006) (concluding specific jurisdiction is claim-specific inquiry because "the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts"); *Kelly*, 301 S.W.3d at 660 (addressing jurisdictional allegations for fraud claim separately from trust-fund claims); *Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 26 (Tex.App.-Houston [1st Dist.] 2010, no pet.) (examining the sufficiency of jurisdictional allegations of

each claim against appellant separately in specific-jurisdiction analysis). But when separate claims are based on the same forum contacts, a claim-specific analysis is not required. *See Touradji,* 316 S.W.3d at 26.

 Here, the parties appear to treat Newton's claims against Twister as arising out of the same facts; Twister contends its arguments related to whether the trial court had specific jurisdiction over it for Newton's misappropriation of trade secrets claim also apply to Newton's claim under the Texas Theft Liability Act. But because our analysis of the relatedness requirement for specific jurisdiction differs for these claims, we will examine each of the claims separately.[3]

### Newton's Misappropriation of Trade Secrets Claim

 Newton's misappropriation of trade secrets claim against Twister centers on the allegations that Twister acquired knowledge of Newton's trade secrets through improper means and that Twister used and continues to use Newton's technology in Twister's products, which were marketed and sold in Texas. Newton asserts "Twister's marketing efforts and sales are the basis" of its claims against Twister. To prevail on its claim for misappropriation of trade secrets, Newton must establish (1) the trade secret existed; (2) the trade secret was acquired through breach of a confidential relationship or was discovered by improper means; (3) the defendant used the trade secret without authorization; and (4) that Newton suffered damages as a result. *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.,* 300 S.W.3d 348, 366–67 (Tex.App.-Dallas 2009, pet. denied); *Trilogy Software, Inc. v. Callidus Software, Inc.,* 143 S.W.3d 452, 463 (Tex.App.-Austin 2004, pet. denied).

Twister contends its marketing and sales contacts in Texas have no connection to the operative facts of Newton's misappropriation claim because Twister's marketing and sales activities did not create its liability. According to Twister, the basis of a claim for misappropriation of trade secrets is the theft or wrongful acquisition of the trade secrets. It claims liability for a misappropriation claim is born by the wrongful acquisition, and therefore the facts related to whether Newton's technology is in Twister's products will be the focus of the trial. Twister claims that even assuming it acquired trade secrets, any acquisition occurred in the Netherlands.

Twister further argues that if the misappropriation of trade secrets claim "was not already born by the acquisition," any liabil-

---

3. We further note that personal jurisdiction over a nonresident defendant cannot be premised on contacts imputed from another person or entity. *See, e.g., Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 773–74 (Tex.1995) (orig. proceeding) (rejecting imputing contacts under civil conspiracy theory). Newton alleged Twister "was and is associated with a business enterprise and has conducted or participated in the operation of the affairs of that enterprise as such affairs pertain to this action." Based on that allegation, Newton brought "aiding and abetting" claims and asserted Twister acted with the other defendants as a single business enterprise. These claims are based on the alleged misappropriation of trade secrets and civil theft claims, and therefore, these claims add nothing to our jurisdictional analysis. In addition, this Court has declined to conclude that a single business enterprise theory can be a basis for piercing the corporate veil for jurisdictional purposes. *See Olympia Capital Assocs., L.P. v. Jackson,* 247 S.W.3d 399, 412 (Tex.App.-Dallas 2008, no pet.) (relying on *PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 173–75 (Tex.2007), and *BMC Software,* 83 S.W.3d at 799)). Thus, we do not further address these claims in our jurisdictional analysis.

ity was created upon "first use" of the trade secrets. Twister maintains that while marketing or selling a product containing another's trade secret is a kind of "use" of the secret, it is not the relevant use from which a cause of action is born. Rather, Twister contends subsequent use of the secret through marketing or selling a product that embodies another's trade secret is relevant only as a basis to quantify damages.

Twister's "first use" contention is based on principles of accrual that apply to limitations defenses. In *Computer Associates International v. Altai, Inc.*, the Texas Supreme Court stated "[a] cause of action for misappropriation of trade secrets accrues when the trade secret is actually used." *Computer Assocs. Int'l v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex.1996). Twister asserts that because a cause of action accrues when a wrongful act causes some legal injury, citing *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex.1996), a misappropriation of trade secrets claim therefore accrues, at the latest, on the first use of the secret. Twister maintains that "knowing when a cause of action for misappropriation of trade secret[s] arose" for limitations purposes means "knowing where it arose" for jurisdictional purposes. Thus, evidence of Twister's marketing contacts in Texas would be irrelevant because the marketing of a product containing a trade secret "necessarily occurred after" Twister's initial use of the secret; that initial use would include using the secret through research, development, manufacturing, or development. Twister argues that Newton did not allege that any other "use" of the secret occurred in Texas, and because its liability, if any, already existed at the time of its marketing and sales activities, Newton's claim does not arise from or relate to those contacts.

Newton claims the "use" of its trade secrets that it alleged occurred in Texas is sufficient for liability; therefore, Twister's Texas contacts are substantially connected to the operative facts of the litigation. We agree with that analysis. In Texas, liability for misappropriation of trade secrets may be premised on disclosure or use of the secret. *See Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, 769 (1958); *Mabrey v. SandStream, Inc.*, 124 S.W.3d 302, 310 (Tex.App.-Fort Worth 2003, no pet.). Specifically, liability for a misappropriation of trade secrets claim occurs if one discloses or uses another's trade secrets, without privilege to do so, if (a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence placed in him by the owner of the secret. *Hyde Corp.*, 314 S.W.2d at 769 (quoting RESTATEMENT OF TORTS § 757 (1939)); *Atl. Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 422 (Tex.App.-Houston [14th Dist.] 1991, writ denied). "Use" of a trade secret has been defined to mean "commercial use" and occurs when "the offending party seeks to profit from the use of the secret." *Atl. Richfield Co.*, 820 S.W.2d at 422; *cf. Global Water Group. Inc. v. Atchley*, 244 S.W.3d 924, 930 (Tex.App.-Dallas 2008, pet. denied) (stating "actual" use or disclosure is required element of claim). "Use" also has been defined more broadly as "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 cmt. c (1995). Although it is unclear whether Texas expressly follows the Restatement (Third) of Unfair Competition, we observe the Texas Supreme Court has acknowledged section 40 and other sections of this Restatement as defining trade secrets and remedies available for their protection. *See Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P.,*

343 S.W.3d 112, 126 n. 5 (Tex.2011); *see also In re Bass*, 113 S.W.3d 735, 739–42 (Tex.2003) (orig. proceeding) (citing section 39 as relevant but not dispositive as to the existence of trade secrets; noting section 757 has been omitted from the Restatement (Second) of Torts and incorporated into the Restatement (Third) of Unfair Competition). Texas courts generally follow the principles of the original Restatement of Torts section 757. *See Am. Derringer Corp. v. Bond*, 924 S.W.2d 773, 776 n. 1 (Tex.App.-Waco 1996, no writ).

 Regardless of how use is defined, no statute or case law has limited liability to a trade secret's "first use." Nor is liability for "use" of a trade secret limited to one type of use—rather, liability for using a trade secret may be created in multiple ways. *See, e.g., Atl. Richfield Co.*, 820 S.W.2d at 422 ("use" of trade secret occurs when offending party seeks to profit from the use of secret); *cf.* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 cmt. c (noting various conduct constituting "use"). If we were to accept Twister's argument, we would be limiting a tortfeasor's liability for misappropriation of trade secrets to the first unauthorized use and similarly eliminating personal jurisdiction for any subsequent misappropriation. We decline that opportunity. While the first unauthorized use of a trade secret may serve as one jurisdictional fact, that use does not preclude other uses from creating other jurisdictional facts.

 We further reject Twister's argument that knowing when a misappropriation cause of action accrues for limitations purposes equates to knowing where the claim arose for jurisdictional purposes. The accrual of a cause of action for statute of limitations purposes has no implications for jurisdiction. "Statute of limitations" is an affirmative defense. *See* TEX.R. CIV. P. 94. An affirmative defense does not tend to rebut a plaintiff's factual allegations; instead, it serves as an independent reason a plaintiff should not recover. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 332 S.W.3d 1, 15 (Tex.App.-Fort Worth 2010, pet. filed) (citing *Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 546 (Tex.1991)). Twister asserts the only use of the trade secrets alleged by Newton was Twister's marketing. It argues that because Texas does not recognize misappropriation as a continuing tort, the marketing, which necessarily occurred after Twister supposedly used the trade secret through research, development, manufacturing, or production, is relevant only to damages. This assertion is intertwined with Twister's "first use" argument. Further, the argument—whether correct or not—goes to the merits a statute of limitations affirmative defense to misappropriation. We are not permitted to resolve merits-based questions in our jurisdictional analysis. *See Michiana*, 168 S.W.3d at 790–91.

For purposes of determining whether Twister's liability—which does not equate to the accrual of a cause of action—arises from or relates to its Texas contacts, we take Newton's pleadings and allegations as true and focus our analysis on the relationship among the defendant, the litigation, and forum. *Moki Mac*, 221 S.W.3d at 585. Newton alleged Twister misappropriated and disclosed Newton's trade secrets and that it used and continues to use Newton's technology for its commercial advantage to Newton's detriment. Newton further alleged Twister's products, including its gas-separation products, contain the Newton technology at issue, and Bloom's affidavit states that Twister incorporated the trade-secret information that he disclosed to Shell Exploration in its products. Newton alleged Twister offers for sale and sells these products in Texas. While the focus of the trial will include issues related to

Twister's acts that may have occurred in the Netherlands, it also will include acts of Twister in Texas, such as how Twister allegedly used or disclosed the trade secrets through marketing and sales in Texas. Regardless of the merits of the allegations, these alleged acts support liability for a misappropriation of trade secrets claim. We therefore conclude the operative facts of the claim are substantially connected to Twister's Texas contacts and the trial court properly denied Twister's special appearance with respect to this claim.

### Newton's Texas Theft Liability Act Claim

 We also conclude the substantial connection element is satisfied with respect to Newton's claim under the Texas Theft Liability Act. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 134.001–.005. The Texas Theft Liability Act imposes civil liability for, among other actions, "unlawfully appropriating property" as described by Texas Penal Code section 31.05. *Id.* §§ 134.002(2), 134.003. Under penal code section 31.05(b), a person commits theft of trade secrets if, without the trade-secret owner's consent, he knowingly: (1) steals a trade secret; (2) copies an article representing a trade secret; or (3) communicates or transmits a trade secret. TEX. PENAL CODE ANN. § 31.05(b) (West 2011). A person who sustains damages resulting from the unlawful appropriation of property under section 31.05 may recover actual damages, as well as additional damages not to exceed $1,000 and attorney's fees. TEX. CIV. PRAC. & REM.CODE ANN. § 134.005.

Twister claims the theft of trade secrets, if any, occurred in the Netherlands. But section 31.05(b) provides that a person commits the offense if he steals, copies, *or* communicates a trade secret if such actions are without the owner's consent. TEX. PENAL CODE ANN. § 31.05(b). Newton alleged Twister "unlawfully misappropriat-ed Newton's Technologies by using and/or disclosing such trade secrets without consent" and that Twister "has directed communications to persons and entities in Texas regarding the Newton technology at issue." Newton also alleged Twister markets and sells its products in Texas that contain the trade secrets at issue. There is no dispute that Twister's Texas contacts concerned its marketing and sales efforts related to its products, which Newton claims incorporate Newton's technology. While the evidence at trial will be directed to the question of whether Twister stole Newton's trade secrets, the evidence also will concern Twister's acts with respect to its communications about the technology directed to persons and entities in Texas. Thus, there is a substantial connection between the operative facts of Newton's civil theft claim and Twister's marketing activities in Texas. We conclude the trial court properly denied Twister's special appearance with respect to Newton's civil theft claim.

### Traditional Notions of Fair Play and Substantial Justice

 Of course, a trial court may not exercise personal jurisdiction over a nonresident defendant if it would offend traditional notions of fair play and substantial justice. *See Asahi Metal Indus. Co.,* 480 U.S. at 113, 107 S.Ct. 1026. To evaluate this component, we consider Twister's contacts in light of (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *Id.; Spir Star AG,* 310 S.W.3d at 878. Twister must present "a compelling case that the presence of some consideration would render jurisdiction un-

reasonable" to defeat jurisdiction. *Spir Star AG*, 310 S.W.3d at 879 (quoting *Guardian Royal*, 815 S.W.2d at 231). We conclude Twister has not met its burden.

Requiring Twister to defend against Newton's claims in Texas would not pose an undue burden on the company. With modern transportation and communication, it is less burdensome for a foreign defendant to defend itself in Texas. Thus, the fact that Twister is headquartered in the Netherlands is not enough to establish an unconstitutional burden on Twister. *Guardian Royal*, 815 S.W.2d at 231 (noting "distance alone ordinarily insufficient to defeat jurisdiction"). Twister also conceded that its contacts with Texas were purposeful. Those contacts include travel to Texas by Twister employees to meet with Texas companies, as well as attendance at trade conferences in Texas.

Twister claims that suit in Texas would be inconvenient because a large portion of its documentary evidence will have to be translated from Dutch to English. Tjeenk Willink's affidavit, however, shows that Twister already produced documents in a related federal suit Newton filed against the other defendants, even though Twister was not a party to the suit. According to Tjeenk Willink, the production consisted of "a large number of documents related to the development of Twister's technology" that Twister made available to the parties in that case and included a "subset of these documents" of approximately 9,000 pages and some video that Twister copied and gave to the parties. We also note that many of the documents submitted as part of the special appearance record were in English. And the record shows the scientific papers presented by Twister employees at trade conferences were written in English. In short, nothing in the record indicates that litigation in a Texas court would be excessively burdensome or inconvenient to Twister.

Texas courts also have an interest in this litigation because of the alleged acts committed against a Texas resident and involving products allegedly containing misappropriated trade secrets, which were marketed or sold to Texas companies. Twister contends Newton's residence is misleading because Newton was created "solely for the purpose of exercising a litigious right" and that Bloom, Newton's predecessor in interest, is a Minnesota resident. Twister claims Bloom's "supposed injuries are the relevant ones." Twister, however, cites to no evidence to support this contention. Newton pleaded it is the sole owner of the Bloom technologies, which it obtained through a series of assignments and agreements. Although he is a likely witness, Bloom is not a party to the dispute.

Finally, Twister urges "extra consideration" because it is a foreign national and because of the "real possibility" that "Newton will not be able to prove its case." It maintains that if Newton has a claim against Twister, Newton should pursue that claim in the Netherlands. Again, the question of whether Twister will prevail on a statute of limitations defense goes to the merits, which we do not address in our jurisdictional review. While we recognize the unique burden placed on a party called to defend itself in a foreign legal system, given Twister's purposeful contacts with Texas, we conclude the burden on Twister is minimal and that the exercise of jurisdiction over it does not offend the traditional notions of fair play and substantial justice.

## CONCLUSION

From our review of the pleadings, affidavits, and exhibits of record, we conclude

Twister had contacts with Texas out of which Newton's claims arose. Consequently, the trial court did not err in denying Twister's special appearance. We affirm the trial court's order and overrule Twister's sole issue.