SPIR STAR AG, Petitioner,

v.

Louis KIMICH, Respondent.

No. 07–0340.

Supreme Court of Texas.

Argued Dec. 10, 2008.

Decided March 12, 2010.

Sarah B. Duncan, Elissa Gail Underwood, Mike A. Hatchell, Locke Lord Bissell & Liddell, LLP, Austin, TX, Rick Lee Oldenettel, Oldenettel & Associates, P.C., Houston, TX, for Petitioner.

Scott Rothenberg, Law Offices of Scott Rothenberg, Keith M. Fletcher, Simmons & Fletcher, Houston, TX, for Respondent.

Chief Justice JEFFERSON delivered the opinion of the Court.

 A foreign manufacturer sold its products in Texas through a Texas distributor. We must decide whether the use of that distributorship insulates the manufacturer from the reach of a Texas court when one of the products injures a Texas citizen. We hold that a manufacturer is subject to specific personal jurisdiction in Texas when it intentionally targets Texas as the marketplace for its products, and that using a distributor-intermediary for that purpose provides no haven from the jurisdiction of a Texas court. Because, in this case, personal jurisdiction comports with traditional notions of fair play and substantial justice, we affirm the court of appeals' judgment.

## I. Factual and Procedural Background

Spir Star AG ("AG"), a German corporation headquartered in Rimbach, Germany, manufactures high-pressure hoses and fittings for sale throughout the world. AG is owned by three German citizens: Werner Büchner, Gerhard Strobach, and Walter de Graaf. In 1995, AG decided that Houston would be the optimal location for a distributorship because the Texas coastal region's numerous refineries were well suited for AG's energy-related products. AG's executives traveled to Houston, leased office space, and established a Texas distributorship, Spir Star Inc., now Spir Star Limited ("Limited"). AG's directors gave Limited permission to use the trademarked "Spir Star" name free of charge. Although it sells products other than AG's, Limited is AG's exclusive distributor in Texas and North America.

AG manufactures hoses that are used primarily in the energy industry. Each month, Limited purchases a maritime container full of AG's products, which are then shipped to the port of Houston. Limited assembles the hoses using AG-provided training and tools and sells them to customers in Texas and elsewhere. Title to the hoses passes to Limited in Europe. The Texas distributorship accounts for thirty-five percent of AG's annual sales, although Limited and AG do not share profits or finances with each other.

De Graaf, AG's president, is also the president of Limited. He splits his time between Houston and Germany, and regularly conducts AG's business in Texas. De Graaf and AG's other two officers own seventy-five percent of Limited; twenty-five percent is owned by Limited employees.

In 2003, an AG high-pressure hose ruptured and seriously injured Louis Kimich. AG had sold the hose to Limited, which in turn sold it to Kimich's employer. Kimich sued his employer and the premises owner, and later added claims against AG and Limited.[1]

AG filed a special appearance, which the trial court and the court of appeals denied. 311 S.W.3d 1. We granted AG's petition for review, 51 Tex. Sup.Ct. J. 1403, 1416 (Sept. 26, 2008), and now affirm.

## II. Applicable Law

 To render a binding judgment, a court must have both subject matter jurisdiction over the controversy and personal jurisdiction over the parties. *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996). Whether a court has personal jurisdiction over a defendant is determined as a matter of law, which appellate courts review de novo. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002). When, as here, a trial court does not issue findings of fact or conclusions of law to

---

1. Limited has not challenged jurisdiction.

support its special-appearance determination, we presume that all factual disputes were resolved in favor of the trial court's ruling. *Id.*

Texas courts have personal jurisdiction over a nonresident defendant when (1) the Texas long-arm statute provides for it, and (2) the exercise of jurisdiction is consistent with federal and state due process guarantees. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002). Our long-arm statute reaches " 'as far as the federal constitutional requirements for due process will allow.' " *Id.* (quoting *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991)). Consequently, the statute's requirements are satisfied if exercising jurisdiction comports with federal due process limitations. *Id.*

If a defendant has never invoked the protections that a forum offers its residents, or has no purposeful contact with it, the forum court's jurisdiction is confined. Personal jurisdiction over nonresident defendants is constitutional only when: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 167 (Tex. 2007). The catchphrase "traditional notions of fair play and substantial justice," first used in *Milliken v. Meyer,* 311 U.S. 457, 463–64, 61 S.Ct. 339, 85 L.Ed. 278 (1940), has its origins in a 1917 decision that referred to both "fair play" and "substantial justice" when the Supreme Court considered whether service by publication comported with the due process clause. *See McDonald v. Mabee,* 243 U.S. 90, 91–92, 37 S.Ct. 343, 61 L.Ed. 608 (1917) (re-

versing a judgment of the Supreme Court of Texas). Since that time, we have incorporated the phrase into our own jurisprudence, beginning with *O'Brien v. Lanpar Co.,* 399 S.W.2d 340, 342 (Tex.1966) (quoting *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154). The phrase remains a hallmark of personal jurisdiction today. *See, e.g., Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 337 (Tex.2009); *PHC–Minden,* 235 S.W.3d at 166; *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007).

Although this "fair play" and "substantial justice" test is well known to appellate courts, the expression is imprecise. It gains meaning, however, when viewed in light of the "minimum contacts" a defendant has with the forum. *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154. Significant contacts suggest that the defendant has taken advantage of forum-related benefits, while minor ones imply that the forum itself was beside the point. When a nonresident defendant has purposefully availed itself of the privilege of conducting business in a foreign jurisdiction, it is both fair and just to subject that defendant to the authority of that forum's courts. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1984).

A defendant's contacts with a forum can give rise to either specific or general jurisdiction. *CSR,* 925 S.W.2d at 595. General jurisdiction exists when a defendant's contacts are continuous and systematic, even if the cause of action did not arise from activities performed in the forum state. *Id.* Here, the court of appeals concluded that AG's continuous and systematic contacts with Texas established general jurisdiction. 311 S.W.3d at 5. We do not reach that issue, however, because we conclude instead that the trial court had specific jurisdiction over AG.

## III. AG satisfies the "additional conduct" standard required for specific jurisdiction.

▮▮▮▮▮ A court has specific jurisdiction over a defendant if its alleged liability arises from or is related to an activity conducted within the forum. *CSR*, 925 S.W.2d at 595. Unlike general jurisdiction, which requires a "more demanding minimum contacts analysis," *id.* at 595, specific jurisdiction "may be asserted when the defendant's forum contacts are isolated or sporadic, but the plaintiff's cause of action arises out of those contacts with the state." 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (3d ed. 2002). In such cases, "we focus on the 'relationship among the defendant, the forum[,] and the litigation.'" *Moki Mac*, 221 S.W.3d at 575–76 (quoting *Guardian Royal*, 815 S.W.2d at 228). Specific jurisdiction is appropriate when (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to the defendant's contacts. *See Retamco*, 278 S.W.3d at 338.

▮▮▮▮▮ The "touchstone of jurisdictional due process [is] 'purposeful availment.'" *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). Purposeful availment requires a defendant to seek some "benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Id.* at 785. Thus, sellers who reach beyond one state and create continuing relationships with residents of another state are subject to the specific jurisdiction of the latter in suits arising from those activities. *Moki Mac*, 221 S.W.3d at 575.

▮▮▮▮ Notably, however, a seller's awareness " 'that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into

an act purposefully directed toward the forum State.'" *CSR*, 925 S.W.2d at 595 (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion)). Instead, our precedent generally follows Justice O'Connor's plurality opinion in *Asahi*, which requires some "additional conduct"—beyond merely placing the product in the stream of commerce-that indicates "an intent or purpose to serve the market in the forum State." *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026; *Moki Mac*, 221 S.W.3d at 577; *Michiana*, 168 S.W.3d at 786. Examples of this additional conduct include: (1) "designing the product for the market in the forum State," (2) "advertising in the forum State," (3) "establishing channels for providing regular advice to customers in the forum State," and (4) "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026; *see also Moki Mac*, 221 S.W.3d at 577; *Michiana*, 168 S.W.3d at 786; *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 201 (Tex.1985). In this case, Kimich argues that AG's substantial sales plus utilization of Limited as its distributor meets this standard.

▮▮▮▮ AG relies on a different line of cases that reject jurisdiction "[w]hen a nonresident defendant purposefully structures transactions to avoid the benefits and protections of a forum's laws." *Am. Type Culture*, 83 S.W.3d at 808. Twice recently we have rejected attempts to sue foreign subsidiaries in Texas based on a parent corporation's contacts, holding that jurisdiction over one does not automatically establish jurisdiction over the other. *PHC–Minden*, 235 S.W.3d at 172; *see also BMC Software*, 83 S.W.3d at 800. Instead, to "fuse" two corporations for jurisdictional purposes, a parent must "control[ ] the

internal business operations and affairs of the subsidiary" to an extent beyond its role as an investor. *PHC–Minden*, 235 S.W.3d at 175.

AG argues the same principles apply here, even though this case involves a foreign corporation's use of a Texas distributorship rather than a parent/subsidiary relationship. The issue is not, however, whether Limited's actions in Texas can be imputed to AG. Rather, our concern is with AG's own conduct directed toward marketing its products in Texas.

 When an out-of-state manufacturer like AG specifically targets Texas as a market for its products, that manufacturer is subject to a product liability suit in Texas based on a product sold here, even if the sales are conducted through a Texas distributor or affiliate. *See Asahi*, 480 U.S. at 112, 107 S.Ct. 1026 ("Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, ... marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."). In such cases, it is not the actions of the Texas intermediary that count, but the actions of the foreign manufacturer who markets and distributes the product to profit from the Texas economy. As the United States Supreme Court stated in *World–Wide Volkswagen Corp. v. Woodson*, purposeful availment of local markets may be either direct (through one's own offices and employees) or indirect (through affiliates or independent distributors):

> [I]f the sale of a product of a manufacturer ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer ... to serve *directly or indirectly,* the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has

there been the source of injury to its owner or to others.

*World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (emphasis added).

 There are several limitations inherent in this rule. First, it is limited to the specific jurisdiction context, because stream-of-commerce analysis "is relevant only to the exercise of specific jurisdiction; it provides no basis for exercising general jurisdiction over a nonresident defendant." *Purdue Research Found. v. Sanofi–Synthelabo, S.A.,* 338 F.3d 773, 788 (7th Cir. 2003); *accord D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.,* 566 F.3d 94, 106 (3rd Cir.2009); *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 380 (5th Cir.2002); *Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 612 (8th Cir.1994); *Moki Mac,* 221 S.W.3d at 579; Joseph S. Pevsner and Gregory W. Curry, *Down the Block But Outside Jurisdiction: Personal Jurisdiction in a Modern World,* 29 Tex. Tech L.Rev. 977, 991 (1998). If sales alone created general jurisdiction, a foreign manufacturer like AG could be sued in Texas for labor practices occurring in Germany even though they had nothing to do with Texas.

 Second, specific jurisdiction is limited to claims that "arise out of or relate to" a nonresident's forum contacts. *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174; *Retamco,* 278 S.W.3d at 338. In such cases, there must be a "substantial connection" between the defendant's contacts and the operative facts of the litigation. *See Moki Mac,* 221 S.W.3d at 585. So when a nonresident's only contacts with Texas involve indirect sales through a distributor or subsidiary, specific jurisdiction is limited to claims arising out of those sales. *See, e.g., Alpine View Co. Ltd. v.*

*Atlas Copco AB,* 205 F.3d 208, 216 (5th Cir.2000) ("Appellants are correct in noting that we have not, in our decisions dealing with the stream-of-commerce theory, entirely foreclosed its application to cases not involving product liability claims. We need not decide here whether the theory is, or is not applicable to a broader range of cases.").

Third, not every product claim against a foreign manufacturer is included; there must be a substantial connection. That similar products were sold in Texas would not create a substantial connection as to products that were not. Similarly, a nonresident that buys a Texas distributor might have no substantial connection with sales that occurred before that purchase. *See Commonwealth Gen. Corp. v. York,* 177 S.W.3d 923, 924 (Tex.2005).

▆ Finally, the manufacturer must have intended to serve the Texas market. *CSR,* 925 S.W.2d at 596. While use of a Texas distributor may satisfy this requirement, there may be situations in which it does not. A Texas distributorship may increase the manufacturer's bottom line because it is more efficient or has greater access to economies of scale, and not because it is intended to serve Texas consumers. *Cf. Asahi,* 480 U.S. at 112, 107 S.Ct. 1026 ("Additional conduct" may include "marketing the product through a distributor *who has agreed to serve as the sales agent in the forum State.*" (emphasis added)).

Many transactions can be structured to avoid any benefit from or availment of Texas law—but not all. A nonresident manufacturer does not avoid Texas law merely by forming a Texas affiliate or utilizing a Texas distributor to sell its products in Texas markets. Just as manufacturers cannot escape liability for defective products by selling them through a subsidiary or distributor, neither can they avoid jurisdiction related to such claims by the same means.

▆ The question is whether AG has purposefully directed acts towards Texas or purposefully availed itself of the benefits and protections of Texas law. We conclude that it has.

**A. AG marketed its products exclusively through Limited, a Texas distributor.**

AG argues that its individual owners—rather than AG itself—established Limited. Even if that were true, by "marketing [its] product through a distributor who has agreed to serve as the sales agent in the forum state," AG has met *Asahi's* "additional conduct standard." *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026.

AG also contends that, because it receives none of Limited's profits and relinquishes title to the hoses before they reach Texas, AG does not benefit from Limited's Texas connections. But AG reaps substantial economic gain through its sales to Limited, its largest distributor by far, responsible for over one-third of AG's annual sales. *See Moki Mac,* 221 S.W.3d at 578 (finding purposeful availment because of foreign corporation's "additional conduct through which it aimed to get extensive business in or from this state"). Indeed, specific jurisdiction over foreign manufacturers is often premised on sales by independent distributors. *See, e.g., Bridgeport Music, Inc. v. Still N The Water Publ'g,* 327 F.3d 472, 483–84 (6th Cir.2003) (finding specific jurisdiction under "additional conduct" standard based in part on nationwide distribution agreement with independent distributor); *Kuenzle v. HTM Sport– Und Freizeitgeräte AG,* 102 F.3d 453, 458 (10th Cir.1996) (noting that "[t]he actions of an independent distributor may not insulate a foreign company from specific jurisdiction"); *Tobin v. Astra Pharm.*

*Prods., Inc.,* 993 F.2d 528, 533–34 (6th Cir.1993) (holding that foreign drug manufacturer who marketed its product in Kentucky through independent distributor was nonetheless subject to personal jurisdiction in forum under *Asahi*'s "additional conduct" standard); *see also Pennzoil Prods. Co. v. Colelli & Assocs.,* 149 F.3d 197, 206–07 (3d Cir.1998) (applying "additional conduct" standard and finding specific jurisdiction in Pennsylvania over Ohio chemical producer who sold products to independent Ohio oil well producers that then sold oil to Pennsylvania refineries).

Thus, it is not persuasive that title to the hoses passed in Europe, rather than in Texas. *See Renner v. Lanard Toys Ltd.,* 33 F.3d 277, 282 (3d Cir.1994) (noting that "a foreign manufacturer or seller [which] rids itself of title by a sale F.O.B. a foreign port [does not] insulate [itself] from jurisdiction if there is the other type of activity" indicating purposeful availment); *Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A.,* 898 F.2d 1071, 1073 (5th Cir.1990) (observing that "the simple fact that a sales transaction is consummated outside that jurisdiction does not prevent the sale from forming the basis of jurisdiction"); *Benitez–Allende v. Alcan Aluminio Do Brasil, S.A.,* 857 F.2d 26, 30 (1st Cir.1988) (holding that title passing in Brazil "is beside the point" in a specific jurisdiction analysis); Charles W. "Rocky" Rhodes, *The Predictability Principle in Personal Jurisdiction Doctrine: A Case Study on the Effects of a "Generally" Too Broad, but "Specifically" Too Narrow Approach to Minimum Contacts,* 57 BAYLOR L.REV. 135, 213 (2005).

**B. AG intended to serve the Texas market, and Kimich's claim arose from AG's purposeful direction of acts towards Texas.**

Not only did AG market its products through a distributor in the forum state,

AG directly targeted the Texas market. In *CSR,* we held that there was no specific jurisdiction over CSR, a foreign asbestos supplier whose product wound up in Texas: CSR's knowledge that its buyer, a pipe manufacturer, had a plant in Texas was not determinative because that manufacturer also had plants in at least four other states, and CSR's awareness that the stream of commerce may sweep the product into Texas " '[did] not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.' " *CSR,* 925 S.W.2d at 595 (quoting *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026). Instead, we held that "there must be some indication that CSR intended to serve the Texas market." *Id.* at 595.

This is consistent with federal authority holding that no specific jurisdiction exists over a manufacturer whose product just happens to end up in the forum state. For example, the Seventh Circuit Court of Appeals recently held that a Danish jack manufacturer was not subject to specific jurisdiction in Indiana, because there was no evidence that the manufacturer had "an awareness or expectation that some of its products would be purchased in Indiana":

In *World–Wide Volkswagen,* the Supreme Court held that personal jurisdiction was lacking because, in part, there was no evidence in the record that any products that the defendants distributed (in that case, automobiles) were ever sold to retail customers in the forum state. Similarly in this case, Jennings produced no evidence that any of AC Hydraulic's products (including the jack at issue in this suit) were ever sold in Indiana. Jennings claims that an Indiana company purchased the jack, but even if we were to accept this unsubstantiated allegation as evidence, Jennings does not tell us in what state or from whom this company purchased the

jack. Additionally, Jennings established that AC Hydraulic sells some of its products to two distributors in Florida, but she did not present any volume information for these sales or provide us with information about where the distributors resell the products, so the scope of any alleged distribution in the rest of the United States, and whether any AC Hydraulic products have been distributed in Indiana, cannot be determined. The bottom line is that, relying on the sparse evidence that Jennings presented, we do not know how the jack in question got to Indiana, or if any other AC Hydraulic products have ever been sold there. It is possible that the "unilateral activity" of a third party, *rather than the defendant's distribution scheme,* landed the jack in Indiana, which is the very scenario that doomed the plaintiffs' case in *World–Wide Volkswagen.*

*Jennings v. AC Hydraulic A/S,* 383 F.3d 546, 550–51 (7th Cir.2004) (internal citations omitted)(emphasis added); [2] *see also Boit v. Gar–Tec Prods., Inc.,* 967 F.2d 671, 683 (1st Cir.1992) (finding no specific jurisdiction over foreign corporation because there was "no evidence that [corporation] intended to serve the market in Maine").

Contrast those cases with the situation here. AG's board of directors created Limited because AG wanted to take advantage of "the biggest economy in the world." Strobach testified that "the whole board ... decided that [Houston would be the best place for a distributor] because we knew that—we thought that would be the greatest need, because of the immediate vicinity of all the refineries." Strobach traveled to Houston because "we wanted to establish an office in Houston." The Board's selection of a Houston office preceded by a few days the arrival of Walter De Graaf, president of both AG and Limited and an employee of each, who signed the documents that created Limited. De Graaf spends half the year working in Houston and is paid by both AG and Limited while there; his contract with AG authorizes him to act on its behalf no matter where he is.

After deciding to establish Limited, AG authorized Limited to use the "Spir Star" name, and Limited became AG's exclusive distributor in Texas and throughout North America. According to one of AG's directors, Limited has been "very successful indeed," and it is AG's largest customer by far. AG has sold millions of dollars worth of hoses to Limited; each month, AG sells Limited a maritime container full of reels of hose, which are shipped to the port of Houston. AG supplies Limited with crimping and assembly tools and written assembly standards, and AG personnel train Limited's employees in hose assembly.

AG's website, authored by one of its employees, states that:

> In order to cover the world-wide market and provide quick service to our customers, office [sic] were opened in the following countries: SPIR STAR France, S.A.R.L. 1991 in Haguenau/France, SPIR STAR Inc. [Limited] 1995 in Housten [sic]/Texas (U.S.A.) and SPIR STAR Asia Pty. Ltd. 1999 in Singapore.

Limited's website, which is written from AG's perspective, states that "the decision was made that the company should expand its activities outside of Europe" and that "we ventured across the Atlantic and

---

**2.** The court did not resolve whether Justice O'Connor's or Justice Brennan's *Asahi* standard should be applied, because the plaintiff failed to make even a threshold showing that AC Hydraulic had an awareness or expectation that some of its products would be purchased in Indiana. *Jennings,* 383 F.3d at 551 n. 2.

founded SPIR STAR, Ltd. in Houston, Texas." The same website touts Limited as "the main link for our growing market share in North and South America." Under the heading "Spir Star Companies," four entities are listed: AG, Limited, Spir Star France, and Spir Star Asia, PTE Ltd. De Graaf, AG's president, testified that he reviewed the content of both websites prior to their publication. The trial court could have believed, as Kimich argues, that AG, acting through its directors and officers, created Limited or that the website statements were admissions by AG. Or the trial court simply could have determined that AG "marketed [its] product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026. If the foregoing evidence does not indicate "an intent or purpose to serve the market in [Texas]," it is difficult to imagine what would. *Cf. id.* (finding no specific jurisdiction in California because "respondents have not demonstrated any action by Asahi to purposefully avail itself of the California market").

Finally, Kimich's claim arose from AG's Texas contacts. *See World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559 ("[I]f the sale of a product of a manufacturer ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer ... to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others."); *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir.1987) ("When the contact stems from a product, sold or manufactured by the foreign defendant, which

has caused harm in the forum state, the court has [specific] jurisdiction" provided defendant purposefully availed itself of the privilege of conducting activities within the forum); *cf. Hicks v. Kawasaki Heavy Indus.*, 452 F.Supp. 130, 134 (M.D.Pa.1978)(noting that "there exists a direct relationship between the cause of action and [Kawasaki's] contacts with the state," as motorcycle sold by foreign manufacturer to distributor "is alleged to have caused injury in the state to a resident of the state"), *cited in Asahi*, 480 U.S. at 112–13, 107 S.Ct. 1026.

## IV. Exercising jurisdiction over AG comports with traditional notions of fair play and substantial justice.

Because AG's Texas contacts support specific jurisdiction, we must now determine whether jurisdiction is consistent with traditional notions of fair play and substantial justice. *Retamco*, 278 S.W.3d at 341. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal*, 815 S.W.2d at 231 (citing *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174). To evaluate this component, we must consider AG's contacts in light of: (1) "the burden on the defendant"; (2) "the interests of the forum state in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; (4) the interstate or international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations or states in furthering fundamental substantive social policies.[3] *Id.* at 231. To defeat jurisdiction,

---

**3.** There is some confusion about a court's need to evaluate the fourth and fifth considerations in cases involving a foreign defendant.

In *Guardian Royal*, we held that in cases involving a foreign defendant rather than two "coequal sovereigns in our federal system, we

AG must present " 'a compelling case that the presence of some consideration would render jurisdiction unreasonable' "—something AG has not done. *See id.* (quoting *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174).

Requiring AG to defend Kimich's claim in Texas would not pose an undue burden for the company. The fact that AG is headquartered in Germany cannot, by itself, defeat jurisdiction. *See id.* at 231 ("Nor is distance alone ordinarily sufficient to defeat jurisdiction: 'modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.' " (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957))). Houston is familiar territory for AG's leadership: its president spends six months of the year there (and can carry on AG's business while there),[4] two of AG's directors traveled to Houston to establish Limited, and one of them returned—at AG's expense— to celebrate Limited's fifth anniversary. *Cf. id.* at 232–33, 78 S.Ct. 199 (finding jurisdiction unreasonable because, among other things, the English defendant was unaffiliated with any American companies). Three of AG's directors collectively own seventy-five percent of Limited, which will be litigating in Houston.

Moreover, Texas has a significant interest in exercising jurisdiction over controversies arising from injuries a Texas resident sustains from products that are purposefully brought into the state and purchased by Texas companies. *Cf. Asahi*, 480 U.S. at 114, 107 S.Ct. 1026 ("Because the plaintiff is not a California resident, California's legitimate interests in the dispute have considerably diminished."); *Guardian*, 815 S.W.2d at 233 ("[S]ince Guardian Royal and U.S. Fire are neither Texas consumers nor insureds, Texas' interest in adjudicating the dispute … is considerably diminished."). Not only would Kimich face an undue burden were he forced to litigate his product liability claim against AG in Germany, but because the claims against Limited will be heard in Texas, it would be more efficient to adjudicate the entire case in the same place. *See Retamco*, 278 S.W.3d at 341 ("[The plaintiff] has an interest in resolving this controversy in Texas because that is where the litigation began."). We recognize "the unique and onerous burden placed on a party called to defend a suit in a foreign legal system." *CSR*, 925 S.W.2d at 595 (citing *Asahi*, 480 U.S. at 114, 107 S.Ct. 1026). In this case, that burden is minimal and is outweighed by Kimich's and Texas's in-

need not consider the interstate judicial system's interest in obtaining the most efficient resolution of controversies or the shared interest of the several states in furthering fundamental substantive social policies," *Guardian Royal*, 815 S.W.2d at 232 n. 17, considerations that would be relevant in a dispute among residents of differing states. While this is true, we failed to explain that in such cases courts must instead consider the interests of "other *nations* whose interests are affected by the assertion of jurisdiction." *Asahi*, 480 U.S. at 115, 107 S.Ct. 1026. Here, the court of appeals examined the international interest in obtaining the most efficient resolution of controversies but failed to consider

the shared interest of the several nations in furthering fundamental substantive social policies. 311 S.W.3d at 8 ("We will not address the fifth factor as only one state is involved in this dispute."). This disparate holding gives us jurisdiction over this interlocutory appeal. TEX. GOV'T CODE § 22.225(c), (e) (noting that one court "holds differently from another when there is inconsistency in their respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants").

4. De Graaf has established a residence in Houston and obtained a "green card" in 2000.

terests in adjudicating the dispute here. *See Asahi*, 480 U.S. at 114, 107 S.Ct. 1026. Asserting personal jurisdiction over AG comports with traditional notions of fair play and substantial justice.

## V. Conclusion

Under the appropriate standard of review, our task ends when, as here, some evidence supports the trial court's denial of AG's special appearance. *BMC*, 83 S.W.3d at 794–95. AG did not merely set its products afloat in a stream of commerce that happened to carry them to Texas. AG "marketed [its] product through a distributor who has agreed to serve as [its] sales agent in [Texas]," *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026, and AG undoubtedly "intended to serve the Texas market," *CSR*, 925 S.W.2d at 595. Further, AG's potential liability arises out of its contacts with Texas, and exercising personal jurisdiction over AG does not offend traditional notions of fair play and substantial justice. The court of appeals and the trial court correctly concluded that Texas courts have personal jurisdiction over this claim against AG. We affirm the court of appeals' judgment. Tex.R.App. P. 60.2(a).