**Appellee's Motion to Dismiss for Lack of Jurisdiction Denied; Affirmed and Opinion filed January 16, 2020.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00127-CV

---

## CONTINENTAL ALLOYS & SERVICES (DELAWARE) LLC AND CONTINENTAL ALLOYS & SERVICES, INC., Appellants

### V.

## YANGZHOU CHENGDE STEEL PIPE CO., LTD. AND CIEC USA INCORPORATION, Appellees

---

**On Appeal from the 189th District Court
Harris County, Texas
Trial Court Cause No. 2015-12653**

---

# O P I N I O N

A company that purchased allegedly defective steel pipe from a distributor sued the distributor and the Chinese company that manufactured the steel, asserting various claims on its own behalf and as assignee of its purchaser. The trial court granted the distributor's motion to dismiss all claims against the distributor based on an arbitration provision in the contract between the distributor and the company

that bought the steel pipe. The trial court later sustained the manufacturer's special appearance and dismissed the claims against the manufacturer for lack of personal jurisdiction. On appeal, the plaintiffs challenge each ruling. Concluding the plaintiffs have not shown that the trial court erred in sustaining the special appearance and that the plaintiffs waived any error in the trial court's granting of the distributor's motion to dismiss, we affirm the trial court's judgment.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Defendant/appellee YangZhou Chengde Steel Pipe Co., Ltd. ("Chengde") manufactures steel pipe, some of which is used by oilfield companies. Chengde, a Chinese company, maintains its principal place of business in China. In July 2013, Chengde entered into two contracts to sell steel pipe to defendant/appellee CIEC USA Incorporation [sic] ("CIEC"), a Texas corporation and distributor of steel products.[1] Each contract required certain specifications for the pipe and required Chengde to perform certain tests on the pipe and to include in the shipping documents an original mill test certificate. Each contract specified that China would be the country of origin of the pipe, and that Chengde would ship the pipe to the Port of Houston, "CIF Houston Port, TX, USA." Under the contracts, title to the pipe passes to CIEC when the pipe is loaded into the vessel at the loading port in China. In each contract, Chengde and CIEC agreed that Chinese law would govern the validity, interpretation, performance, and enforcement of the contract and that all disputes in connection with the contract would be settled by arbitration in Beijing, China.

On the same day that CIEC entered into the contracts to buy steel pipe from Chengde, CIEC entered into two contracts to sell the steel pipe to "Continental

---

[1] In their opening brief, the appellants cite these contracts as the contracts that "called for Chengde to deliver the defective steel products at issue in this litigation. . . ."

Alloys & Services (DELAWARE) Inc." The name of the buyer in these contracts appears to have been misstated, and there may be some uncertainty as to whether the buyer is appellant/plaintiff Continental Alloys & Services (Delaware) LLC ("Continental LLC") or appellant/plaintiff Continental Alloys & Services, Inc. ("Continental, Inc."). Each of these of these parties is a Delaware entity with its principal place of business in Texas. In this opinion, we shall refer to the Continental entity that entered into the contracts with CIEC as the "Continental Party."

The Continental Party apparently bought the steel pipe from CIEC to provide the pipe to Baker Hughes, an oilfield service company that had ordered steel pipe from a Continental entity.[2] Each of the two contracts between CIEC and the Continental Party provides that Texas law governs the validity, interpretation, performance, and enforcement of the contract and that all disputes in connection with that contract will be resolved by arbitration in Houston, Texas.

Continental LLC and Continental, Inc. (collectively the "Continental Parties") allege that the steel pipe Chengde sold to CIEC and that the Continental Party bought from CIEC contained defects, did not conform to industry standards or to Baker Hughes's specifications, and failed the implied warranties of merchantability and fitness for a particular purpose. According to the Continental Parties, after Baker Hughes demanded arbitration of its claims against the Continental Parties, the Continental Parties negotiated a settlement of Baker Hughes's claims against them and assigned to the Continental Parties Baker Hughes's claims against CIEC and Chengde.

The Continental Parties sued Chengde and CIEC, asserting claims against Chengde for fraud, negligent misrepresentation, breach of express warranty, breach

---

[2] It is not clear from the record which Baker Hughes entity was involved.

3

of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, and indemnity under section 82.002 of the Texas Civil Practice and Remedies Code. The Continental Parties asserted claims against CIEC for breaches of the implied warranty of merchantability and of the implied warranty of fitness for a particular purpose. The Continental Parties brought all claims in their own name, and they asserted all claims except for the indemnity claims "as the assignee of Baker Hughes's claims."

Shortly after answering the lawsuit, CIEC filed a motion to dismiss all claims against it on the ground that the Continental Parties were required to arbitrate these claims under the arbitration provisions in the contracts between the Continental Party and CIEC. In response, the Continental Parties did not dispute that their own claims against CIEC are subject to arbitration and did not oppose the motion as to these claims. But, as to the Continental Parties' claims as assignee of Baker Hughes, they opposed the motion and argued that these claims are not subject to arbitration. The trial court granted this motion in its entirety and dismissed all of the Continental Parties' claims against CIEC "in favor of binding arbitration."

Nine months later and before the trial court ruled on Chengde's special appearance, the Continental Parties amended their petition so that they no longer asserted any claims against CIEC. Under the amended pleading, CIEC was no longer a defendant. The trial court later sustained Chengde's amended special appearance and dismissed all claims against Chengde for lack of personal jurisdiction, thus rendering a final judgment.

## II. ISSUES AND ANALYSIS

On appeal, the Continental Parties raise eight issues. In the first five, they challenge the trial court's order sustaining Chengde's amended special appearance.

4

In their sixth, seventh, and eighth issues, they challenge the trial court's granting of CIEC's motion to dismiss as to the assigned claims. Before we tackle the merits of the appeal, we first address Chengde's motion to dismiss for lack of jurisdiction, which we have taken with the case.

## A.    Does this court have appellate jurisdiction in this case?

If the deadline to file a notice of appeal was extended to 90 days after the trial court signed the judgment, then the Continental Parties timely filed their notice of appeal. *See* Tex. R. App. P. 26.1.   If this deadline was not extended and the deadline was 30 days after the trial court signed the judgment, then the Continental Parties' notice of appeal was late and this court lacks appellate jurisdiction.  The Continental Parties did not file a motion for new trial, motion to modify the judgment, or a motion to reinstate under Texas Rule of Civil Procedure 165a.  The Continental Parties did timely file a request for findings of fact and conclusions of law as to the trial court's ruling on the special appearance.[3] Therefore, the appellate deadline was extended if findings and conclusions either are required by the Rules of Civil Procedure or properly could be considered by the appellate court. *See id*.  The Rules of Civil Procedure do not require a trial court to issue findings and conclusions as to a special-appearance ruling, so the issue is whether we properly could consider findings and conclusions as to the trial court's special-appearance ruling. *See id*.

A request for findings of fact and conclusions of law does not extend the time for perfecting appeal of a judgment rendered as a matter of law because, in that context, findings and conclusions can have no purpose and should not be

---

[3] The Continental Parties also timely filed a notice of past due findings of fact and conclusions of law.  The trial court never issued any findings or conclusions.  The Continental Parties have not assigned error on appeal as to the trial court's failure to issue findings and conclusions.

requested, made, or considered on appeal. *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp*, 938 S.W.2d 440, 443 (Tex. 1997). The Supreme Court of Texas has given the following examples of this context: "summary judgment, judgment after directed verdict, judgment non obstante veredicto, default judgment awarding liquidated damages, dismissal for want of prosecution without an evidentiary hearing, dismissal for want of jurisdiction without an evidentiary hearing, dismissal based on the pleadings or special exceptions, and any judgment rendered without an evidentiary hearing." *Id.* The high court has given the following examples of situations in which the Rules of Civil Procedure do not require findings and conclusions but the appellate court properly could consider them: "default judgment on a claim for unliquidated damages, judgment rendered as sanctions, and any judgment based in any part on an evidentiary hearing." *Id.*

The trial court did not conduct an evidentiary hearing on Chengde's amended special appearance. Based on this fact, Chengde asserts that the trial court's special-appearance ruling was not based in any part on an evidentiary hearing, and therefore this court could not properly consider any findings that the trial court might have issued. Though a trial court may hold an evidentiary hearing on a special appearance, the court also may consider stipulations, affidavits, documents, and the results of discovery processes that the parties file with the court. *See* Tex. R. App. P. 120a (stating that the trial court shall determine a special appearance "on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony"); *Phillips Dev. & Realty, LLC v. LJA Eng'g, Inc.*, 499 S.W.3d 78, 85 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Thus, in a special-appearance context, the absence of an evidentiary hearing does not necessarily mean that the trial court ruled without

6

considering any evidence or ruled as a matter of law based on stipulations. *See id.* Likewise, the absence of an evidentiary hearing alone does not mean that this court could not properly consider findings and conclusions as to the trial court's special-appearance ruling. *See* Tex. R. App. P. 120a; *Phillips Dev. & Realty, LLC*, 499 S.W.3d at 85.

Chengde also suggests that the trial court made its special-appearance ruling based on stipulated facts, and therefore the trial court ruled as a matter of law based on agreed facts. Though the parties stipulated to various facts relating to Chengde's amended special appearance, Chengde also submitted an affidavit of Xiaowei "Wade" Ge that contained factual statements to which the Continental Parties did not stipulate. And, the Continental Parties also submitted a declaration of Randall Zajicek containing statements to which Chengde did not stipulate. The stipulations contained hundreds of pages of documents, and as to many of these documents, the parties did not stipulate to the substance of the documents or their contents. In sum, the record reflects that the trial court made its special-appearance ruling based in part on stipulations of fact and in part on evidence. So, even though the trial court did not conduct an evidentiary hearing, this case is like the high court's example of "any judgment based in any part on an evidentiary hearing." *IKB Indus. (Nigeria) Ltd.*, 938 S.W.2d at 443. If the trial court had chosen to issue findings of fact and conclusions of law as to the trial court's special-appearance ruling, this court properly could have considered the findings and conclusions. *See id.*; *Goldberg v. Zinn*, 2013 WL 2456869, at *6 (Tex. App.—Houston [14th Dist.] June 6, 2013, no pet.) (mem. op.) (holding that request for findings and conclusions extended appellate deadline even though there was no evidentiary hearing, because the trial court ruled based in part on evidence submitted to the court by the parties); *Brown v. Pennington*, No. 05-14-01349-CV,

2015 WL 3958618, at \*4–8 (Tex. App.—Dallas June 30, 2015, no pet.) (considering trial court's findings of fact and conclusions of law regarding a special appearance, in case in which trial court did not conduct an evidentiary hearing but ruling based on documentary evidence filed with the court) (mem. op.).

We conclude that the request for findings and conclusions extended the deadline to file a notice of appeal and that the Continental Parties timely filed their notice of appeal. *See* Tex. R. App. P. 26.1; *IKB Indus. (Nigeria) Ltd.*, 938 S.W.2d at 443; *Goldberg*, 2013 WL 2456869, at \*6. We thus have appellate jurisdiction, and we deny Chengde's motion to dismiss for lack of jurisdiction.

## B. Did the trial court err in sustaining Chengde's special appearance?

In their first five issues, the Continental Parties assert that the trial court erred by sustaining Chengde's amended special appearance. We begin by addressing the applicable legal standards and then consider the jurisdictional evidence, specific jurisdiction, and general jurisdiction.[4]

### 1. Standard of Review

Whether the Continental Parties are subject to personal jurisdiction in Texas is a question of law subject to de novo review. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). When, as in today's case, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the trial court's ruling that are supported by evidence. *M&F Worldwide Corp. v. Pepsi–Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 884–85 (Tex. 2017).

---

[4] The Continental Parties do not allege that Chengde is the alter ego of any other entity.

8

### 2. *Legal Standards as to the Exercise of Personal Jurisdiction*

The Texas long-arm statute allows a court to exercise personal jurisdiction as far as the federal constitutional requirements of due process will permit. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (West, Westlaw through 2019 R.S.); *BMC Software*, 83 S.W.3d at 795. The plaintiff bears the initial burden of pleading allegations sufficient to confer jurisdiction under the Texas long-arm statute. *See Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013). The long-arm statute allows the exercise of personal jurisdiction over a nonresident defendant who "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state" or who "commits a tort in whole or in part in [Texas]." Tex. Civ. Prac. & Rem. Code § 17.042(1),(2) (West, Westlaw through 2019 R.S.). The Continental Parties satisfied their initial burden by alleging that the Chengde was doing business in Texas within the meaning of subsections (1) and (2) of Texas Civil Practice and Remedies Code section 17.042. *See id.*; *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 149. Because the Continental Parties met this initial burden, the burden shifted to Chengde to negate all potential bases for personal jurisdiction the Continental Parties alleged. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 149.

Personal jurisdiction over a nonresident defendant is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state and (2) the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. *See BMC Software*, 83 S.W.3d at 795. For a defendant to have sufficient contacts with the forum, it is essential that there be some act by which the defendant "purposefully avails" itself of the privilege of conducting activities in the forum state, thus invoking the benefits and protections of its laws. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784

9

(Tex. 2005). In analyzing personal jurisdiction, only the defendant's purposeful contacts with the forum count; personal jurisdiction over a defendant cannot be based on the unilateral activity of another party. *Id.* at 785. A seller who reaches out beyond one state and creates continuing relationships and obligations with citizens of another state is subject to the personal jurisdiction of the latter in suits based on the seller's activities. *Id.* By contrast, a defendant should not be subject to a Texas court's jurisdiction based upon random, fortuitous, or attenuated contacts. *Id.* For there to be purposeful availment, a defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction. *Id.* A nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction. *Id.*

Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant purposefully has established minimum contacts with Texas. *BMC Software*, 83 S.W.3d at 795. The concept of foreseeability is implicit in the requirement that there be a substantial connection between the defendant and Texas arising from the defendant's conduct purposefully directed toward Texas. *See Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 227 (Tex. 1991).

Specific jurisdiction exists when the claims in question arise from or relate to the defendant's purposeful contacts with Texas. *Am. Type Culture Collection Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002). In conducting a specific-jurisdiction analysis, we focus on the relationship among the defendant, Texas, and the litigation. *See Guardian Royal*, 815 S.W.2d at 228. For a nonresident defendant's contacts with Texas to support an exercise of specific jurisdiction, there must be a substantial connection between the defendant's purposeful contacts

with Texas and the operative facts of the litigation. *See Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007).

A seller's awareness that the stream of commerce may or will sweep the seller's product into Texas does not convert the mere act of placing the product in the stream into an act purposefully directed toward Texas. *See Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010). Instead, the Supreme Court of Texas generally follows Justice O'Connor's plurality opinion in *Asahi,* which requires some "additional conduct" — beyond merely placing the product in the stream of commerce — that indicates "an intent or purpose to serve the market in the forum State." *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion); *see Spir Star AG*, 310 S.W.3d at 873. Examples of this additional conduct include: (1) "designing the product for the market in the forum State," (2) "advertising in the forum State," (3) "establishing channels for providing regular advice to customers in the forum State," and (4) "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026; *see Spir Star AG*, 310 S.W.3d at 873.

### 3. The Stipulations and the Jurisdictional Evidence

The Continental Parties and Chengde stipulated to the following facts relating to Chengde's amended special appearance:

1. Chengde manufactures steel pipe, some of which is used by oilfield services companies.

2. Chengde's North American Sales Manager, Wade Ge, maintained a mobile phone number from mid-2011 or early 2012, until sometime in 2012 or 2013. Chengde furnished Ge with this cell phone, which he sometimes used to contact customers or potential customers in the United States.

3.      Exhibit A attached to the stipulations is a true and correct copy of a business card that Chengde had printed for Ge.

4.      Exhibits B.l to B.93 attached to the stipulations are true and correct copies of contracts by which Chengde sold steel pipe that was shipped to the Port of Houston between 2010 and 2014.

5.      Chengde manufactured and sold over $51 million worth of steel pipe that was shipped to the Port of Houston from January 2010 through December 2014. Texas was not the final destination for all pipe Chengde shipped to the Port of Houston.

6.      Chengde was on the Approved Vendor List for Baker Hughes, an oilfield services company based in Texas.

7.      Exhibit C attached to the stipulations is a true and correct copy of email communications from January 4-8, 2011, among Chengde, the Continental Parties, and Hangzhou Cogeneration regarding Baker Hughes's audit of the Chengde mill.

8.      After Baker Hughes conducted its audit of the Chengde mill, Chengde became an approved Baker Hughes vendor.

9.      In connection with Chengde becoming an approved vendor for Baker Hughes, Baker Hughes requested that Chengde provide Baker Hughes with a sample ring for testing. Exhibit D attached to the stipulations is a true and correct copy of email communications from January 27-28, 2011, between Chengde and Baker Hughes regarding this testing. At Baker Hughes's direction, Chengde sent the sample ring to Baker Hughes in Texas.

10.     Ge traveled to Texas on behalf of Chengde in March 2011, to meet with customers and potential customers of Chengde. On that trip, Ge met with representatives of the Continental Parties. The meeting took place at the Continental Parties' office in Spring, Texas on March 22, 2011. Exhibit E attached to the stipulations is a true and correct copy of email communications among Chengde, the Continental Parties, and CIEC regarding Ge's visit.

11.     Ge traveled to Texas on behalf of Chengde in June 2011 to meet with customers and potential customers of Chengde. While in Texas, Ge met with the Continental Parties to discuss Chengde's new products and improvements. The meeting was arranged by Singapore (Cogeneration) Steel Pte., Ltd. and Hangzhou Cogeneration Imp. & Exp. Co., Ltd, and took place at the Continental Parties' office in

Spring, Texas on June 8, 2011. Exhibit F attached to the stipulations is a true and correct copy of email communications among Chengde, the Continental Parties, and CIEC regarding Ge's visit.

12.     Attached to the stipulations as Exhibit G is a true and correct copy of email communications among Chengde, the Continental Parties, and CIEC from June 22, 2011 through June 27, 2011.

13.     Exhibit H attached to the stipulations is a true and correct copy of an email communication dated July 25, 2011 from CIEC notifying Chengde that it had been approved as a vendor for Baker Hughes and attaching "Baker Hughes Approved Mill List by Name," dated July 14, 2011.

14.     On or about October 21, 2013, Ge met with Baker Hughes at Baker Hughes's office in Houston, Texas. At that meeting, Ge personally handed the business card attached to the stipulations as Exhibit I to a Baker Hughes employee.

15.     Attached to the stipulations as Exhibits J.l through J.9 are true and correct copies of contracts between Chengde and CIEC.

16.     Attached to the stipulations as Exhibits K.l and K.2 are true and correct copies of certificates prepared by Chengde related to steel pipe at issue in this case.

17.     Attached to the stipulations as Exhibit L is a true and correct copy of email communications among Chengde, the Continental Parties, and CIEC from March 15, 2014 to April 15, 2014, regarding testing related to the steel products at issue in this case.

18.     Attached to the stipulations as Exhibit M is a true and correct copy of an "Invitation Letter" from Chengde regarding the Continental Parties' visit to the Chengde mill in April 2014.

19.     Attached to the stipulations as Exhibit N is a true and correct copy of an "Invitation Letter" from Chengde regarding Baker Hughes's visit to the Chengde mill in April 2014.

20.     Attached to the stipulations as Exhibit O is a true and correct copy of a Power Point presentation prepared by Chengde and provided to Baker Hughes and the Continental Parties at the Chengde mill in April 2014.

21.    In May 2014, Wade Ge and Jason Wang traveled to Texas to attend a meeting with the Continental Parties and Baker Hughes to attempt to resolve issues regarding the steel pipe at issue in this case. The meeting took place on or about May 9, 2014, at the Continental Parties' office in Spring, Texas.

22.    In July 2014, Wade Ge and Jason Wang again traveled to Texas to attend a meeting with the Continental Parties and Baker Hughes to attempt to resolve issues regarding the steel pipe at issue in this case. The meeting took place on or about July 18, 2014, at the Continental Parties' office in Spring, Texas.

The Continental Parties submitted a declaration of Randall Craig Zajicek, the President of Continental, Inc., in which he testifies that, on April 10, 2014, while attending a trade show in Germany, Zajicek met Wade Ge, whom Zajicek understood to be the North American Sales Manager for Chengde. Zajicek attached to his declaration a copy of the business card that Ge handed Zajicek at that time. This business card is the same card attached as Exhibit A to the stipulations.

Chengde submitted the affidavit of Ge, in which he testified as follows:

- Ge is Chengde's "Sales Manager-North America."

- Chengde was founded in China in 2006.

- Chengde's headquarters and principal place of business are in China.

- Chengde has no offices in Texas.

- Chengde has no employees in Texas.

- Chengde does not advertise in Texas.

- Chengde does not pay taxes in Texas.

- Chengde does not own property in Texas.

- Chengde has no bank account in Texas.

- Chengde has no agreement with anyone to market its products in Texas.

14

- Chengde has sold products to buyers located in Texas; however, these sales account for a very small portion of Chengde's total sales.

- From 2009 through 2014, the percentage of Chengde's total sales to Texas buyers were as follows: about 0.23%, about 9.5%, 0.17%, 1.46%, 1.75%, and 2.20%.

- The total percentage of Chengde's sales to Texas customers from Chengde's founding in 2006 through the end of 2014 is 2.27%.

- Chengde has no contracts with Continental, Inc., Continental, LLC, or Baker Hughes.

- From mid-2011 or early 2012, until sometime in 2012 or 2013, Ge maintained a cell phone number with a 713 area code. Chengde furnished Ge with this cell phone, which Ge sometimes used to contact customers or potential customers in the United States.

- In January 2011, two auditors for Baker Hughes came to the Chengde steel mill in China to determine whether Chengde could be a Baker Hughes "approved mill." Chengde did not request Baker Hughes's approval or in any way solicit this visit from Baker Hughes.

- In April 2014, representatives of Baker Hughes and Continental, Inc. came to the Chengde steel mill in China to review the production of pipe manufactured by Chengde. Chengde did not sell this pipe to Baker Hughes or Continental, Inc.

### 4. *Specific-Jurisdiction Analysis*

As to the specific-jurisdiction analysis, on appeal, the Continental Parties allege that Chengde entered into contracts with CIEC to deliver the steel pipe to the Port of Houston in Texas. But, those contracts do not require Chengde to deliver the steel pipe to the Port of Houston in Texas. Instead, the contracts require Chengde to ship the steel pipe to the Port of Houston, "CIF Houston Port, TX, USA." The term "CIF Port of Houston, Texas" means that Chengde would pay the

15

cost, insurance, and freight to ship the steel pipe by sea to the destination port and would provide CIEC with the documents to obtain the steel pipe from the vessel or other carrier. *See Lansing Trade Group, LLC v. 3B Biofuels GmbH & Co., KG*, 612 F. Supp. 2d 813, 817 (S.D. Tex. 2009). The term "CIF" also means that CIEC bears all risk of loss or damage to the goods from the time they pass the ship's rail at the port of shipment in China. *See id*. In the contracts, Chengde and CIEC agree that title to the pipe passes to CIEC when the pipe is loaded into the vessel at the port of shipment in China. In each contract, Chengde and CIEC agreed that Chinese law would govern the validity, interpretation, performance, and enforcement of the contract and that all disputes in connection with the contract would be settled by arbitration in Beijing, China. Thus, the unambiguous language of the contracts does not require that Chengde deliver the pipe to the Port of Houston; instead, it requires that Chengde ship the pipe to the Port of Houston and pay the cost, insurance, and freight for this shipment, with title and risk of loss passing to CIEC when the pipe is loaded on the vessel in China. *See id*.

The Continental Parties cite the *Spir Star* case from the Supreme Court of Texas for the proposition that Chengde cannot rely on the passage-of-title term and the structure of the sales transaction to avoid being subject to personal jurisdiction in Texas courts. *See Spir Star AG*, 310 S.W.3d at 875–76. In the *Spir Star* case, the high court stated that many transactions could be structured to avoid the seller being subject to the exercise of personal jurisdiction by Texas courts, but that the structure of the transaction in that case did not do so. *See id.* In *Spir Star*, the German manufacturer created a Texas distributor who agreed to serve as the manufacturer's sales agent in Texas, marketed its products through that distributor, and made over one-third of its annual sales to the Texas distributor. *See id.* In the face of these facts, the high court stated that the passage of title to the distributor in

16

Germany and the fact that the profits from the subsequent sale of the product accrued to the distributor were not a basis for the manufacturer to avoid the exercise of personal jurisdiction by Texas courts. *See id.* In today's case, the total percentage of Chengde's sales to Texas customers from Chengde's founding in 2006 through the end of 2014 was 2.27%. There is no evidence that Chengde created CIEC or that CIEC agreed to serve as Chengde's sales agent in Texas. The *Spir Star* case is not on point. *See id.*

In addition, today's case does not involve the "additional conduct" Justice O'Connor described in the plurality opinion in *Asahi*, which Texas has adopted. *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026; *see Spir Star AG*, 310 S.W.3d at 873. The record contains no evidence that Chengde has (1) designed its steel pipe for the market in Texas, (2) advertised in Texas, (3) established channels for providing regular advice to customers in Texas, or (4) marketed the product through a distributor who had agreed to serve as Chengde's sales agent in Texas. *See Asahi,* 480 U.S. at 112, 107 S.Ct. 1026; *see Spir Star AG*, 310 S.W.3d at 873.

The Continental Parties cite to Ge's use of a Chengde business card indicating that Ge had an office in Houston and that he had a Houston cell phone number. The Continental Parties do not assert that Chengde actually had a Houston office, and the office address on Ge's card was the address of an office of CIEC. The card did list a Houston cell phone number, but it also listed a phone number and fax number in China. Though the parties stipulated that Ge had the Houston cell phone from mid-2011 or early 2012 through 2013, at the latest, the only evidence of Ge using the business card — in October 2013 and in April 2014 — occurred after CIEC ordered the steel pipe from Chengde under the July 2013 contracts. The record contains no evidence that Ge called any person working for CIEC, Continental, LLC, or Continental, Inc. using the Texas cell phone.

17

The Continental Parties also assert that Ge made unsolicited trips to Texas in 2011, for the purpose of marketing Chengde steel products and that year took steps to become an approved manufacturer of steel products for Baker Hughes. Presuming that Chengde had these contacts with Texas, the Continental Parties have not shown that a substantial connection exists between these contacts and the operative facts of this litigation. *See Moki Mac River Expeditions*, 221 S.W.3d at 585.

Under the applicable standard of review, we conclude that the Continental Parties have not shown that the trial court erred in implicitly concluding that specific jurisdiction does not apply and that no substantial connection exists between Chengde's purposeful contacts with Texas and the operative facts of the litigation. *See id*.; *Michiana Easy Livin' Country, Inc.*, 168 S.W.3d at 785–86; *see also Belden Technologies, Inc. v. LS Corp.*, 829 F.Supp.2d 260, 270–71 (D. Del. 2010).

### 5.    *General-Jurisdiction Analysis*

The Continental Parties also assert that the trial court erred in not exercising jurisdiction over Chengde based on general jurisdiction.  They cite Chengde's more than 100 contracts with various Texas entities to sell its steel products and the more than $51 million dollars of steel products shipped to the Port of Houston since January 2010.  General jurisdiction is present only when a defendant not only has continuous and systematic contacts with the forum state, but also has these kinds of contacts to such an extent that they make the defendant essentially at home in that state.  *See Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 72–73 (Tex. 2016).  Chengde is a Chinese company with its principal place of business in China.  Courts have found no general jurisdiction in cases with many more goods flowing into and out of the forum than are present in the case under review.  *See,*

18

*e.g., Reyes v. Marine Drilling Cos.*, 944 S.W.2d 401, 402–05 (Tex. App.—Houston [14th Dist.] 1997, no writ) (finding no general jurisdiction despite purchases of more than $183 million in goods in Texas from 471 sources, hundreds of contracts with Texas entities, and sales of more than $850,000 of scrap metal to Texas companies); *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 372–73, 375–76 (5th Cir. 1987) (finding no general jurisdiction despite $250 million in products flowing into Texas over five years, $72 million in contracts for products manufactured in Texas, and more than $195 million in goods and services purchased from more than 500 Texas vendors).

Under the applicable standard of review, we conclude that the Continental Parties have not shown that the trial court erred in implicitly concluding that general jurisdiction does not apply and that Chengde does not have continuous and systematic contacts with Texas to such an extent that the contacts make Chengde essentially at home in Texas. *See Searcy*, 496 S.W.3d at 72–73; *Reyes*, 944 S.W.2d at 402–05; *Bearry*, 818 F.2d at 372–73, 375–76.

Because the Continental Parties have not shown that the trial court erred in concluding that the trial court could not exercise personal jurisdiction over Chengde based on either specific or general jurisdiction, we overrule the Continental Parties' first five issues.

### C. Did the Continental Parties waive their challenges to the trial court's dismissal of their claims against CIEC by abandoning these claims?

In their sixth, seventh and eighth issues, the Continental Parties challenge the trial court's granting of CIEC's motion to dismiss as to their claims against CIEC as assignee of Baker Hughes. In its interlocutory order granting this motion, the trial court dismissed all claims the Continental Parties asserted against CIEC

"in favor of binding arbitration." The trial court did not sever the Continental Parties' claims against CIEC into a different case to create a final judgment. Instead, the case continued, Chengde amended its special appearance, and Chengde and the Continental Parties filed their stipulations of fact regarding the special appearance. Nine months after the trial court granted CIEC's motion to dismiss, and before the trial court ruled on Chengde's amended special appearance, the Continental Parties filed a "First Amended Original Petition," in which they amended their pleading so that they no longer asserted any claims against CIEC. The Continental Parties no longer named CIEC as a defendant. They revised the style of the amended pleading to show Chengde as the sole defendant. In the amended petition, the Continental Parties neither asserted claims against CIEC nor sought any relief against CIEC.

An amended petition supersedes and supplants all previous pleadings. *See* Tex. R. Civ. P. 65 *Amerigroup Texas, Inc. v. True View Surgery Ctr., L.P.*, 490 S.W.3d 562, 570 (Tex. App.—Houston [14th Dist.] 2016, no pet.). The law treats claims omitted from the amended pleading as dismissed and abandoned. *See Amerigroup Texas, Inc.*, 490 S.W.3d at 570; *Randolph v. Walker*, 29 S.W.3d 271, 274 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Even presuming that the trial court erred in dismissing a plaintiff's claims against one of the defendants, the plaintiff loses its right to complain about this error on appeal if, after the trial court's erroneous ruling on these claims, the plaintiff files an amended pleading abandoning the claims upon which the trial court ruled. *See Amerigroup Texas, Inc.*, 490 S.W.3d at 570; *Randolph*, 29 S.W.3d at 274.

In their amended petition, the Continental Parties omitted all claims against CIEC and no longer named CIEC as a defendant in the case. The amended petition contains no language stating that the Continental Parties were not dismissing,

waiving, or abandoning their claims against CIEC or that the Continental Parties reserved the right to appeal the trial court's granting of CIEC's motion to dismiss. By filing the amended petition, the Continental Parties dismissed and abandoned their claims against CIEC and waived any error in the trial court's order granting CIEC's motion to dismiss. *See Amerigroup Texas, Inc.*, 490 S.W.3d at 570 (holding that plaintiff waived any error in trial court's partial summary judgment dismissing certain claims by amending its petition after the trial court's ruling to omit those claims, thus abandoning and dismissing the claims); *Randolph,* 29 S.W.3d at 274–75 (concluding that plaintiffs waived any error in trial court's interlocutory order striking their claims against two defendants by omitting their claims against these defendants from amended pleadings filed after the trial court's ruling). Therefore, we overrule the Continental Parties' sixth, seventh, and eighth issues.

### III. CONCLUSION

The Continental Parties' request for findings and conclusions extended the deadline to file a notice of appeal, and the Continental Parties timely filed their notice of appeal. Because this court has appellate jurisdiction, we deny Chengde's motion to dismiss for lack of jurisdiction.

The Continental Parties have not shown that the trial court erred in concluding that the trial court could not exercise personal jurisdiction over Chengde based on either specific or general jurisdiction. Therefore, we affirm the trial court's order sustaining Chengde's amended special appearance.

By filing their amended petition the Continental Parties dismissed and abandoned their claims against CIEC and waived any error in the trial court's order granting CIEC's motion to dismiss. So, we overrule the Continental Parties'

21

challenges to this order.

/s/    Kem Thompson Frost
        Chief Justice

Panel consists of Chief Justice Frost and Justices Bourliot and Poissant.