

# NUMBER 13-25-00526-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

VALE S.A.,                                                          Appellant,

v.

ITABIRIÇU NACIONAL DE
PESQUISA MINERAL LTDA.,                              Appellee.

## ON APPEAL FROM THE COUNTY COURT AT LAW NO. 2
## OF NUECES COUNTY, TEXAS

## MEMORANDUM OPINION

### Before Justices Peña, West, and Fonseca
### Memorandum Opinion by Justice Fonseca

This case concerns the alleged theft of millions of tons of low-grade iron ore mined in Brazil. Appellee Itabiriçu Nacional de Pesquisa Mineral Ltda. (Itabiriçu) sued appellant Vale S.A. (Vale) in Nueces County, claiming that Vale wrongfully appropriated the ore and sold some of it in Texas. The trial court denied Vale's special appearance, and Vale

argues by one issue in this appeal that it erred in doing so. Because we agree, we reverse and render.

## I. BACKGROUND

Vale is a Brazilian mining company with operations in over thirty countries, and it is the world's largest producer of iron ore. Since its founding, Vale has owned and operated a vast open-pit mine complex located in Itabira in the Brazilian state of Minas Gerais. At the complex, Vale extracts iron from raw ore, resulting in large amounts of solid and liquid waste byproducts, or tailings. At the Itabira Mining Complex, Vale would store tailings, which are potentially toxic and environmentally hazardous, in an area known as the "Polygonal."

Itabiriçu is also a mining company based in Brazil. It was formed in 2014 to explore and develop opportunities involving the use and repurposing of iron ore tailings. As part of those efforts, it allegedly acquired a permit from the government of Brazil granting it mineral rights to the Polygonal. According to Itabiriçu, Vale previously forfeited its mineral rights to the Polygonal when it submitted a "Negative Final Research Report" in 2010 formally declaring to the Brazilian government that there were no minerals to be extracted there. Nevertheless, despite Itabiriçu's permit, Vale allegedly prevented Itabiriçu from accessing the Polygonal, claiming that such access would interfere with its operations in the rest of the complex. Itabiriçu sued Vale in Brazil in order to gain access to the site; Vale also brought legal proceedings against Itabiriçu in Brazil. According to Itabiriçu, the Brazilian government rejected Vale's request to prevent other companies from conducting research or operations in the Polygonal, and Brazilian courts concluded that Itabiriçu is entitled to ownership of "any minerals" located there and to access the site.

On October 20, 2023, Itabiriçu filed the instant suit against Vale in Nueces County Court at Law No. 2 complaining about the above-referenced acts and also alleging that Vale "s[old] and conspir[ed] to sell its ill-gotten goods" to Voestalpine, a steel manufacturer which owns and operates a mill near Corpus Christi.[1] According to Itabiriçu, the sales agreement between Vale and Voestalpine was negotiated in Texas and the ore at issue was shipped directly to Corpus Christi from the Port of Tubarão in the state of Espírito Santo, Brazil. Itabiriçu further alleged that the majority of Voestalpine's Texas operations were sold to ArcelorMittal, the world's largest steel producer, in April 2022.[2] Itabiriçu brought claims of conversion, unjust enrichment, and conspiracy against Vale, Voestalpine, and ArcelorMittal.[3] Regarding personal jurisdiction, Itabiriçu alleged that the court had general jurisdiction over Voestalpine and ArcelorMittal "because they reside in, and conduct business, in the State of Texas." It further argued that the court had specific jurisdiction over all defendants because:

> [o]n information and belief, the sales of iron ore were consummated in Nueces County, Texas, and the purchased iron ore was delivered through Nueces County as well. Each of Itabiriçu's claims against Defendants arise from the theft, transportation, and subsequent sale of the ore and the conspiracy to steal, transport, and sell the iron ore.

In its live fourth amended petition, Itabiriçu elaborated as follows:

> Vale took and sold approximately 108,500,000 metric tons of iron ore, comprised of materials that [Itabiriçu] had (and continues to have) the legal right to possess, use, and economically benefit from. On information and belief, after unlawfully extracting these materials, Vale processed it,

---

[1] Voestalpine AG is based in Austria. In its Nueces County suit, Itabiriçu named Voestalpine AG's United States-based subsidiaries, Voestalpine Texas, LLC, and Voestalpine US Holding, LLC, as defendants. We refer to these defendants collectively as Voestalpine.

[2] ArcelorMittal S.A. is based in Luxembourg. In its Nueces County suit, Itabiriçu named ArcelorMittal S.A.'s United States-based subsidiaries, ArcelorMittal Texas HBI, LLC and ArcelorMittal Texas HBI Holdings, LLC, as defendants. We refer to these defendants collectively as ArcelorMittal.

[3] Itabiriçu also initially asserted claims of money had and received, civil theft, quantum meruit, and tortious interference with contract; however, it abandoned those claims in its live petition.

transported it, and exported it through the Port of Tubarão to Texas. On information and belief, Vale sold this ill-gotten ore to [Voestalpine], and to [ArcelorMittal] following [its] acquisition of Voestalpine Texas in April 2022.

On July 18, 2024, Vale filed a special appearance and answer subject to the special appearance, arguing in part that Itabiriçu's "alleged claims do not arise from or relate to any substantial connection Vale has with Texas." It later filed two amended special appearances with evidence, including affidavits by two corporate representatives and copies of the sales contracts governing its transactions with Voestalpine and ArcelorMittal. Itabiriçu filed a response arguing in part:

> Vale's efforts to sell and successful sales of iron ore to Texas from Tubarão as described above give rise to claims of conversion, unjust enrichment, and conspiracy to convert iron ore that was mined in Brazil and shipped to Texas. . . . While this case does *involve* Itabiriçu's rights to iron ore in the Polygonal, this case *revolves* around iron ore going from Brazil *into Texas* and what happened in Texas between Vale and Texas Defendants.

Vale filed a reply to the response.

After a hearing, the trial court denied Vale's special appearance by written order dated October 3, 2025. It later filed findings of fact and conclusions of law, including in relevant part:

### I. FINDINGS OF FACT

. . . .

3. Vale targeted Texas through a sustained, multi-year course of conduct with its co-Defendants, including direct negotiations, repeated visits, and the execution of contracts specifically to serve the Texas market.

. . . .

5. Vale held multiple meetings with Voestalpine in August 2013 and September 2013—prior to any sales in Texas—regarding how Vale could best serve the Texas market and to explore the possibility of a "partnership with [Voestalpine] in Texas."

4

. . . .

7.  In fact, testifying as a corporate representative, [Renato Prado Ferraro, Vale's iron ore sales director for Japan, Korea, and Southeast Asia,] confirmed that Vale intended to be "the main provider of [iron ore] pellets to Texas."

8.  In a 2014 email, Ferraro described this project as Vale's "Texas Project Supply."

    . . . .

9.  Ferraro testified on behalf of Vale that he personally visited Texas multiple times between 2014 and 2020 in his sales capacity and that, during these visits, he met with Voestalpine Texas employees.

10. These meetings concerned both the technical and commercial purposes of the Texas Project.

    . . . .

13. Ferraro described the contract [between Vale and Voestalpine] in an email to Voestalpine as Vale's "Texas contract."

14. When asked (repeatedly) why Vale referenced the contract with Voestalpine as the "Texas contract," [Ferraro] explained: "We would call it the Texas contract because it was the easiest way to identify the client . . . ."

15. Shortly after the execution of the contract, Vale characterized Vale and Voestalpine as having "a strong partnership in Texas."

    . . . .

16. Vale representatives visited Voestalpine in Texas following the execution of the Texas Contract including in March 2017 and July 2019.

17. Vale and Voestalpine entered into at least one additional contract related to the subject matter of the Texas Contract (with terms negotiated in Texas), and Vale further proposed extending its contractual relationship with Voestalpine into 2021.

    . . . .

19. Vale repeatedly sold and shipped millions of tons of iron ore to Voestalpine and [ArcelorMittal] in Texas, for hundreds of millions of dollars—as evidenced by over 40 bills of lading.

5

20. Vale also admits that in the relevant time, Vale took iron from the "disputed area" in the Polygonal, Vale transported it to plants in the Itabira Mining Complex, and that iron eventually went to Tubarão for shipping around the world.

21. Vale further claims it is impossible to segregate the ore because it was comingled by Vale with other iron ore.

22. Itabiriçu claims that this comingled ore is comprised, in part, of materials rightfully belonging to Itabiriçu.

## II. CONCLUSIONS OF LAW

23. Given the foregoing, this Court's exercise of specific personal jurisdiction over Vale is appropriate.

24. In its live pleading, Itabiriçu has pleaded "allegations that suffice to permit a court's exercise of personal jurisdiction over the nonresident defendant."

25. Because Itabiriçu has met its burden, Vale "assumes the burden of negating all potential bases for personal jurisdiction that exist in the plaintiff's pleadings." Vale has not met this burden.

26. First, Vale has availed itself of the privilege of conducting activities within Texas, thus invoking the benefits and protections of its laws.

27. Activities evidencing Vale's purposeful availment include (1) Vale's contemplation of an investment in Voestalpine's Texas plant itself; (2) Vale's negotiation of the Texas Contract; (3) Vale's technical and commercial meetings in Texas; (4) Vale's execution of the Texas Contract; (5) Vale's ongoing contract negotiations, amendments, and extensions; (6) Vale's on-site support to its Texas contractual counterparts; and (7) Vale's shipments from Tubarão to Texas.

28. Second, Itabiriçu's claims against Vale arise out of or relate to Vale's Texas-focused activities.

29. Itabiriçu's claims are principally concerned with Vale's Texas-based conduct and the Texas contracts.

30. Vale's Texas contracts, the subject matter thereof, and Vale's Texas-based conduct will be the focus of the trial and consume most if not all of the litigation's attention.

31. Vale's Texas contracts, the subject matter thereof, and Vale's Texas-based conduct are related to the operative facts of the claim.

6

32. Vale's efforts to sell and successful sales of iron ore to Texas from Tubarão give rise to claims of conversion, unjust enrichment, and conspiracy to convert iron ore that was mined in Brazil and shipped to Texas.

33. Third, exercising specific personal jurisdiction over Vale does not offend traditional notions of fair play and substantial justice.

34. Vale is a large company with sufficient resources to defend this matter in Texas.

35. Moreover, Texas has a special interest in this case as it involves wrongfully obtained goods being shipped in and out of the state.

. . . .

37. Accordingly, the Court DENIES Vale's Second Amended Special Appearance.

(Emphasis and internal record references omitted.) This accelerated interlocutory appeal followed. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7).[4]

## II. DISCUSSION

## A. Personal Jurisdiction

Texas's long-arm jurisdiction statute permits Texas courts to exercise personal jurisdiction over any nonresident defendant that "does business" in this State. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 166 (Tex. 2007); *see* TEX. CIV. PRAC. & REM. CODE § 17.042. The statute's "broad language" extends Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *PHC-Minden*, 235 S.W.3d at 166; *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *U-Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex. 1977). Therefore, "the requirements of the Texas long-arm statute are satisfied if the

---

[4] On January 6, 2026, we granted Vale's motion to stay its discovery obligations in the trial court during the pendency of this appeal. *See* TEX. R. APP. P. 29.3.

7

exercise of personal jurisdiction comports with federal due process limitations." *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996).

The exercise of personal jurisdiction satisfies federal Constitutional due process requirements only if (1) the nonresident defendant has established "minimum contacts" with the forum state and (2) the exercise of jurisdiction "comports with traditional notions of fair play and substantial justice." *PHC-Minden*, 235 S.W.3d at 166 (*citing Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). When a nonresident defendant "purposefully avails" itself of the privileges and benefits of conducting business in a foreign jurisdiction, it has minimum contacts with the forum state sufficient to confer personal jurisdiction. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013) (citing *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). A showing of purposeful availment requires that a defendant seek some "benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010).

Only the defendant's purposeful contacts are relevant to the minimum contacts inquiry; unilateral activity of another party or third person, or random, isolated, or fortuitous contacts by the defendant, are insufficient to prove purposeful availment. *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, LP*, 493 S.W.3d 65, 70 (Tex. 2016) (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)). Further, a seller's awareness "that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *CSR*, 925 S.W.2d at 595 (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112 (1987) (plurality

opinion)). Instead, there must be some "additional conduct," beyond merely placing the product in the stream of commerce, that indicates "an intent or purpose to serve the market in the forum State." *Spir Star*, 310 S.W.3d at 873 (first citing *Asahi*, 480 U.S. at 112; then citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 577 (Tex. 2007); and then citing *Michiana*, 168 S.W.3d at 786). And a defendant may engage in "purposeful avoidance" by structuring its transactions in such a way as "neither to profit from the forum's laws nor subject itself to jurisdiction" there. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 68 (Tex. 2016).

There are two types of personal jurisdiction: general and specific. *Cornerstone Healthcare*, 493 S.W.3d at 71; *see Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 (1984). General jurisdiction exists when a defendant's contacts are continuous and systematic, even if the cause of action did not arise from activities performed in the forum state. *Spir Star*, 310 S.W.3d at 872; *CSR*, 925 S.W.2d at 595 ("General jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction."). It is undisputed that Vale has no offices, employees, or property in Texas, and Itabiriçu never argued that the trial court has general jurisdiction over Vale. We therefore confine our analysis to specific jurisdiction.

The exercise of specific jurisdiction is appropriate only when the plaintiff's claim "arises from or relates to" the defendant's contacts with the forum state. *Cornerstone Healthcare*, 493 S.W.3d at 71 (citing *Spir Star*, 310 S.W.3d at 873). In other words, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585. Under this rule, "[s]ellers who 'reach out beyond

one state and create continuing relationships and obligations with citizens of another state' are subject to the jurisdiction of the latter in suits based on their activities." *Michiana*, 168 S.W.3d at 785 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)).

## B.    Special Appearance

Any party named in a lawsuit may make a special appearance to challenge the trial court's personal jurisdiction over it. TEX. R. CIV. P. 120a.1. The trial court "shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." *Id.* R. 120a.3.

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law we review de novo. *Searcy*, 496 S.W.3d at 66; *Moki Mac*, 221 S.W.3d at 574; *BMC Software Belg.*, 83 S.W.3d at 795.

## C.    Analysis

On appeal, Vale observes that the contracts governing its sales of iron ore to Voestalpine: (1) name Voestalpine's Austrian parent company as the designated "buyer"; (2) name Vale's Switzerland-based subsidiary, Vale International S.A. (Vale International), as the designated "seller"; (3) were executed in Switzerland; (4) state that the ore was to be delivered "on a FOB basis Tubarão Port, Brazil"; and (5) do not mention Texas. According to Vale, this shows that the decision to have the ore shipped from Brazil to Corpus Christi was a unilateral decision made by Voestalpine (and later ArcelorMittal) and does not show that Vale purposefully availed itself of the privileges of conducting

business here. *See* TEX. BUS. & COM. CODE § 2.319(a) (defining "FOB");[5] *Spir Star*, 310 S.W.3d at 873; *see also Burger King*, 471 U.S. at 474 ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."). Indeed, Vale argues that the contracts demonstrate it attempted to purposefully avoid the jurisdiction of this State. *See Searcy*, 496 S.W.3d at 68.

Vale additionally argues that, even if it purposefully availed itself of the privileges of doing business here, personal jurisdiction does not lie because Itabiriçu's claims do not have a substantial connection to Vale's activities directed to Texas. *See Moki Mac*, 221 S.W.3d at 585. On this point, we agree.

In a sworn declaration attached to the special appearance, Vale's iron ore sales director for Europe and North Atlantic, Renata Costa Zingre, stated in relevant part as follows:

> 6. My understanding is that Vale transports some of the raw iron ore that it produces in its mining complexes to beneficiation plants. At the beneficiation plants, the ore is processed and transformed into a coarse powder, known as "pellet feed." The pellet feed is then

---

[5] Section 2.139(a) of the Texas Business and Commerce Code states:

Unless otherwise agreed the term F.O.B. (which means "free on board") at a named place, even though used only in connection with the stated price, is a delivery term under which

(1) when the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in this chapter . . . and bear the expense and risk of putting them into the possession of the carrier; or

(2) when the term is F.O.B. the place of destination, the seller must at his own expense and risk transport the goods to that place and there tender delivery of them in the manner provided in this chapter . . . ;

(3) when under either Subdivision (1) or (2) the term is also F.O.B. vessel, car or other vehicle, the seller must in addition at his own expense and risk load the goods on board. If the term is F.O.B. vessel the buyer must name the vessel and in an appropriate case the seller must comply with the provisions of this chapter on the form of bill of lading . . . .

TEX. BUS. & COM. CODE § 2.319(a); *see NuStar Energy, L.P. v. Hancock*, 731 S.W.3d 288, 296 (Tex. 2026).

transported to pelletizing plants.

7. My understanding is that the Brazilian Port of Tubarão, near the city of Vitória, State of Espírito Santo, receives pellet feed from multiple Vale mining complexes across Brazil. Vale operates six to eight pelletizing plants within the area of the Port of Tubarão. At each of these plants, the pellet feed undergoes a process where it is transformed into small, spherical iron ore pellets. There are generally two grades of iron pellets: Blast Furnace Pellets and Direct Reduction Pellets. The pellets are used in different processes to produce steel.

8. After the pellets are produced at one of Vale's six to eight pelletizing plants in Tubarão, Vale then transports pellets to the Tubarão port's loading dock for shipment to domestic and international markets.

. . . .

11. The purpose of Vale International's purchase/sale agreements with [Voestalpine] and [ArcelorMittal] is for Vale to sell various grades of iron ore to [Voestalpine] or [ArcelorMittal]. I understand that [Voestalpine] and [ArcelorMittal] then transport the ore from Brazil to steel plants that are located in various international locations.

12. To my understanding, at no point did Vale contemplate that any of Vale's obligations under the purchase/sale agreement would be performed in the State of Texas. Further to my understanding, many of Vale International's purchase/sale agreements with [Voestalpine] and [ArcelorMittal] are made on a free-on-board ("F.O.B.") basis, meaning that the responsibility for the iron ore pellets and all obligations relating to them pass from Vale to [Voestalpine] or [ArcelorMittal] at such time that Vale delivers the pellets to the designated shipping vessel. . . . For F.O.B. transactions, the shipping vessel is chartered and directed by [Voestalpine] or [ArcelorMittal].

13. Under the purchase/sale agreements, [Voestalpine] or [ArcelorMittal] requests delivery of a certain grade of ore and designates a shipping vessel at the appropriate loading port enumerated in the contract. . . . Vale then delivers the ore to a designated vessel that is chartered and directed by [Voestalpine] or [ArcelorMittal]. Vale's responsibilities concerning the ore terminate at that point.

14. Under the purchase/sale agreements, Vale's responsibility was to supply the product to [Voestalpine] and [ArcelorMittal]. [Voestalpine] and [ArcelorMittal] then decided where to ship its product. [Voestalpine] and [ArcelorMittal]—not Vale—determine the

12

destination port of the shipments. The location of the destination port is known to Vale for the purposes of compliance with the terms of the contracts and customs regulations in Brazil.

15. Here, as relevant to shipments of pellets to Texas under the purchase/sale agreements, all deliveries of the pellets to [Voestalpine] and [ArcelorMittal] were made on an F.O.B. basis at the Brazilian Port. [Voestalpine] and [ArcelorMittal] chartered the vessels to have the pellets collected and determined that they were to be transported to Texas.

16. Vale International negotiated the purchase/sale agreement with [Voestalpine] through Vale International's office in Switzerland and [Voestalpine's] office in Austria. To my understanding, [Voestalpine's United States-based subsidiaries] were not involved in those negotiations. I am not aware of any negotiations pertaining to these contracts that occurred in Texas. When [Voestalpine] makes payment under the purchase/sale agreement, it wires the relevant funds from its bank account in Austria to Vale's bank account in New York . . . . I am not aware of any Vale financial transaction pertaining to these contracts that flows through Texas.

17. Prior to 2022, Vale International and [ArcelorMittal] entered into purchase/sale agreements concerning Vale's sale of iron ore to various destinations around the world, but that did not include Texas. I understand that, in 2022, [ArcelorMittal] acquired a majority stake in a steel plant located in Portland, Texas. Subject to final terms, [ArcelorMittal] then requested in 2023—and Vale agreed—that the terms of the operative contract and the memorandum of understanding between Vale International and [ArcelorMittal] would apply to all shipments made to the Texas plant. . . .

18. Vale International negotiated the operative purchase/sale agreement and the memorandum of understanding with [ArcelorMittal] through Vale International's office in Switzerland and [ArcelorMittal's] office in Luxembourg. It is my understanding that [ArcelorMittal's United States-based subsidiaries] were not involved in those negotiations. I am not aware of any negotiations pertaining to these contracts that occurred in Texas. When [ArcelorMittal] makes payment under the purchase/sale agreement, it wires the relevant funds from its bank account in New York . . . to Vale's bank account in New York. I am not aware of any financial transaction pertaining to these contracts that flows through Texas.

In a separate declaration, Kesley Julianelli, Vale's "Director of Integrated Planning and

Supply Chain, Iron Ore," stated in relevant part:

13

3.     It is my understanding that the products at issue in this case are iron ore pellets. Iron ore pellets are produced by the following method. Vale mines various forms of raw ore, such as hematite or itabirite, from any one of its 22 mines. Vale then transports some of its raw ore to its beneficiation plants. Vale operates over 20 beneficiation plants across its seven mining complexes. At the beneficiation plants, the ore can be processed and transformed into three different products: lump ore, sinter feed, and pellet feed.

4.     The pellet feed product from beneficiation plants is then transported to several pelletizing plants that Vale operates. Before entering the pelletizing plant, the pellet feed is blended with deliveries of pellet feed from mining complexes across Brazil. Combining deliveries of pellet feed from multiple sources is necessary to maintain the volume of pellet feed needed to sustain operations at each of the several pelletizing plants.

. . . .

10.    The process of iron ore extraction separates iron ore from waste rock (low-grade material with no economic value). After that extraction, the waste rock is deposited in a waste pile. The unprocessed iron ore, known as "Run of Mine," is fed into beneficiation plants, resulting in final products such as lump ore, sinter feed, and pellet feed. The waste material generated from the beneficiation process is known as "tailings." These tailings are iron-poor residues, which are generated during the production process and are not utilized as marketable products. The tailings can be deposited into storage sites, which include structures known as "tailings dams."

11     Within the Itabira Mining Complex, the waste rock was deposited into waste piles. The Polygonal encompassed 27% of a waste pile. The waste that was deposited in that particular pile consisted of hard itabirite. The hard itabirite in that pile was stored there temporarily until a beneficiation plant within the Itabira complex had the technical capacity to process it. Accordingly, the hard itabirite in that pile was temporarily considered waste until it was able to be processed. The Polygonal also encompassed part of a tailings dam.

12.    I understand that Itabiriçu's petition in this litigation claims a property interest in material that it incorrectly describes as "iron tailings." The materials in the waste pile, however, were actually hard itabirite— and not tailings. No tailings inside the dam were ever remined and processed for sale.

13.    My understanding is that, over the period of 2015 to 2021, Vale collected the hard itabirite it had previously deposited in the waste

14

pile, which is partially within the Polygonal, and sent it to the three beneficiation plants within the Itabira Mining Complex to be processed into pellet feed. The hard itabirite from the section or the waste pile within the Polygonal was combined with the Run of Mine from other mines within the Itabira Mining Complex when it was sent to the beneficiation plants for processing into pellet feed. The pellet feed from the beneficiation plants was then transported from the Itabira Mining Complex via train to pelletizing plants in the Brazilian Port of Tubarão. At Tubarão, the pellet feed that arrived from Itabira was blended with pellet feed from other mining complexes across Brazil and fed to the six to eight pelletizing plants where it was transformed into iron ore pellets.

14. I understand that Itabiriçu claims that iron ore pellets, which purportedly consisted of material from the waste pile within the Polygonal, were sold to Vale's customers and ultimately arrived in Texas for use in steel operations. It is not possible to determine whether any iron ore pellets that were shipped to Texas contained any hard itabirite from a specific waste pile within the Itabira Mining Complex.

15. As explained above, within the Itabira Mining Complex alone, Vale operates three beneficiation plants. During the time in which the hard itabirite from the Polygonal was collected, that hard itabirite was entirely combined with Run of Mine from mines within the Itabira Mining Complex before it was fed into any of the three beneficiation plants in the complex. And once the pellet feed from those beneficiation plants arrived in Tubarão, it was blended with pellet feed from mining complexes all over Brazil before being fed into any or the six to eight pelletizing plans.

16. Accordingly, it is impossible to determine whether any or the iron pellets shipped by Voestalpine and ArcelorMittal to Texas contained hard itabirite from the waste pile that is partly within the Polygonal.

The record contains no evidence controverting the testimony of Zingre or Julianelli.

To support specific jurisdiction, the defendant's activities in the forum state must "relate[] to the operative facts" of the litigation. *See id.* at 584 (citing *Rush v. Savchuk*, 444 U.S. 320, 329 (1980)). In *Moki Mac*, evidence of the defendant's Texas contacts was insufficient to support specific jurisdiction because the "operative facts" of the suit occurred in Arizona. *Id.* at 585. But here, despite the alleged theft occurring in Brazil, the

15

trial court found specific jurisdiction based on Vale's multiple meetings with Voestalpine's subsidiaries in Texas, both before and after the sales contracts were executed, and Vale's representative's description of the contract with Voestalpine as the "Texas contract."

On appeal, Itabiriçu appears to acknowledge that Vale "exercised dominion and control" over the subject ore while it was located in Brazil. It contends that, though this fact may establish that its conversion claim *accrued* in Brazil, it does not preclude a determination that the claim has a "substantial connection" to Vale's Texas-based activities. *See Twister B.V. v. Newton Rsch. Partners, LP*, 364 S.W.3d 428, 439 (Tex. App.—Dallas 2012, no pet.) ("The accrual of a cause of action for statute of limitations purposes has no implications for jurisdiction."). That may be true in a general sense, but the actual record in this case does not support such a determination. Even assuming the evidence supported all of the trial court's findings of fact regarding Vale's activities in Texas, none of those activities are related in any substantial way to the actual conduct which Itabiriçu complains about in its suit—i.e., Vale's alleged theft of iron ore and its alleged refusal to grant Itabiriçu access to the Polygonal. All of Itabiriçu's claims are dependent on its assertion that it owned mineral rights to the Polygonal under Brazilian law by virtue of its government-issued permit. Assuming this is true, Vale's alleged conversion of the ore would have been complete at the time it was removed from the Polygonal—the ultimate foreign destination of the ore is irrelevant to the question of whether it was unlawfully appropriated in the first place. The record thus firmly refutes the trial court's conclusion that Itabiriçu's claims "are principally concerned with Vale's Texas-based conduct and the Texas contract." Instead, based on the facts alleged in Itabiriçu's pleadings, a trial on Itabiriçu's conversion claim would focus predominantly—if not

16

exclusively—on Vale's activities in Brazil.

The same is true for Itabiriçu's claims of unjust enrichment and conspiracy, which rely on the same underlying fact allegations. *See M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 887 (Tex. 2017) ("[A] nonresident's alleged conspiracy with a Texas resident does not confer personal jurisdiction over the nonresident in Texas."); *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi–Edinburg 2002, pet. denied) ("[U]njust enrichment is not a distinct independent cause of action but simply a theory of recovery.").[6] We note that, to support its conspiracy claim, Itabiriçu alleged in its live petition that Voestalpine "was aware (or should have been aware) when purchasing the iron pellets that at least part was comprised of the ill-gotten [m]ining [r]esidues Itabiriçu had the right to possess." Relatedly, it accused Voestalpine and ArcelorMittal of "fencing" the stolen ore. However, it did not point to any evidence supporting either allegation in its response to the special appearance, nor does it on appeal.

In arguing that a theft completed outside Texas may support specific jurisdiction in this state, Itabiriçu cites *Rowland & Rowland P.C. v. Texas Employers Indemnity Co.*, 973 S.W.2d 432, 433 (Tex. App.—Austin 1998, no pet.). In that matter, a Texas truck driver was killed in an accident in Tennessee, and his widow was awarded death benefits from

---

[6] "The mere existence or allegation of a conspiracy directed at Texas is not sufficient to confer jurisdiction." *Old Republic Nat'l Title Ins. v. Bell*, 549 S.W.3d 550, 560 (Tex. 2018). To comport with due process, the exercise of long-arm jurisdiction over a defendant "must rest not on a conceptual device but on a finding that the non-resident, through his relationship with another, has purposefully availed himself of the privilege of conducting activities within the forum State." *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) (internal quotations omitted). This relationship "may be described in terms of conspiracy, but such a characterization should not mask the real facts of the relationship or avoid analysis of the attribution process." *Id.* (noting "[t]he term 'conspiracy' is meaningful only to the extent that it helps to elucidate these facts"); *see Schroeder v. Valdez*, 941 S.W.2d 312, 315 (Tex. App.—Corpus Christi–Edinburg 1997, orig. proceeding) (noting "due process will not permit the plaintiff to use insignificant acts in the forum to assert jurisdiction over all co-conspirators").

appellee TEIC, the worker's compensation carrier for the decedent's employer. *Id.* The widow and her adult children also filed a wrongful death suit against the State of Tennessee in that state, and TEIC asserted subrogation rights. *See id.* at 433–34. At one point, Rowland (the family's Tennessee counsel) sent a letter directly to TEIC in Texas, acknowledging that he would "continue to protect [TEIC's] subrogation claim without the necessity of [TEIC] being added as a party" and would "continue to represent [TEIC's] interests in this matter." *Id.* at 434. However, after the widow and her children were awarded $217,000 from the State of Tennessee, Rowland refused to honor TEIC's subrogation claim as to the children's share of the award, and instead distributed that share directly to the children in Texas. *Id.* TEIC sued Rowland in Travis County for breach of contract and conversion, and the trial court denied Rowland's special appearance. *Id.* at 435. The court of appeals affirmed, concluding that Rowland "had a least two purposeful contacts with Texas": (1) the letter its counsel sent directly to TEIC's Texas office, and (2) its distribution of funds to the decedent's children in Texas. *Id.* at 435–36. Crucially, the court further held that

> it was these specific "contacts" which give rise to the claims TEIC asserts against [Rowland]. In particular, it is TEIC's contention that [Rowland's] promise to "protect" its subrogation interest was breached or misrepresented when the firm distributed the proceeds to [decedent's] children before satisfying TEIC's subrogation lien. . . . [Rowland's] promise to "protect" TEIC's subrogation interest in Texas and [its] distribution of substantial proceeds in Texas are sufficient purposeful minimum contacts with this State to satisfy due process.

*Id.* at 436. Itabiriçu also cites *Energium Health v. Gabali*, in which a federal district court found specific jurisdiction over a defendant in a theft suit despite the fact that the "alleged conversion was not consummated in Texas." No. 3:21-CV-2951-S, 2022 WL 16842660, at *14–15 (N.D. Tex. Nov. 9, 2022) (noting defendants allegedly "enticed" plaintiff to send

18

allegedly stolen inventory and equipment to Texas with "promises of more potential business").

We do not find these cases controlling. In *Rowland*, the defendant reached into Texas to form an agreement with TEIC, and TEIC's suit alleged a breach of *that same agreement*. 973 S.W.2d at 436. Similarly, in *Energium Health*, the theft "would not have occurred" but for the defendants' "purposeful efforts to reach into [Texas] and induce a forum resident to do business with [them] in reliance on their alleged misrepresentations." 2022 WL 16842660, at *15 (citation modified). Here, on the other hand, Itabiriçu does not allege that Vale breached any contract made in Texas or committed any part of a tort here, nor does it allege that Vale's contracts to sell ore to Voestalpine and ArcelorMittal were "but for" causes of Vale's alleged conversion. Instead, the only connection between these contracts and Itabiriçu's claims is that some of the ore which was allegedly converted was later sold pursuant to these contracts and delivered to Corpus Christi. According to Zingre's uncontroverted testimony, the contracts specified that title to the ore transferred to Voestalpine and ArcelorMittal while it was still situated in Brazil, and the decision to ship the ore to Texas was made exclusively by the purchasers. Even if Vale itself decided to "distribut[e] substantial proceeds" of the alleged conversion to customers in Texas, the cited cases do not hold that such a finding may alone support specific jurisdiction. *See Moki Mac*, 221 S.W.3d at 577 (noting "the mere sale of a product to a Texas resident will not generally suffice to confer specific jurisdiction upon our courts").

In any event, *Rowland* and *Energium Health* are factually distinguishable because the property which was distributed to Texas in those cases was directly and exclusively traceable to the defendant's alleged tortious behavior. *See* 973 S.W.2d at 436; 2022 WL

19

16842660, at *15. On the other hand, Julianelli testified that Vale takes raw ore from "any one of its 22 mines in Brazil," transports it for processing at one of "over 20" beneficiation plants, and then transports all of the processed ore together to one of "six to eight" pelletizing plants, including one at the port of Tubarão. She stated that the specific waste ore at issue in this case was "combined with Run of Mine from other mines within the Itabira Mining Complex" before being pelletized and was "blended with pellet feed from other mining complexes across Brazil" before being delivered to port. It is therefore impossible to determine whether, and to what extent, the shipments to Corpus Christi contained ore which had been removed from the Polygonal.

Citing *Humble Oil & Refining Co. v. West*, Itabiriçu contends that "as the entity that wrongfully took the ore and commingled it," Vale "has the burden to differentiate," and if it fails to meet that burden, "it's liable for the whole amount." 508 S.W.2d 812, 813 (Tex. 1974) ("[T]he burden is on the one commingling the goods to properly identify the aliquot share of each owner; thus, if goods are so confused as to render the mixture incapable of proper division according to the pre-existing rights of the parties, the loss must fall on the one who occasioned the mixture."). Even assuming that Vale had such a burden and failed to meet it, there is still nothing in the record indicating that Vale's alleged theft "ar[o]se from or relates to" any contacts with Texas. *See Spir Star*, 310 S.W.3d at 873. Moreover, under these facts, if a Texas court has personal jurisdiction over Vale, then so would *any* court in *any* country that received shipments of ore mined by Vale and purchased from Vale in Brazil. Such a conclusion would not "comport[] with traditional notions of fair play and substantial justice." *See PHC-Minden*, 235 S.W.3d at 166.

For the foregoing reasons, we conclude there is no "substantial connection"

20

between Vale's contacts with Texas and the operative facts of Itabiriçu's claims. *See Weeks Marine Co. v. Landa*, 629 S.W.3d 742, 751 (Tex. App.—San Antonio 2021, no pet.) (finding no specific jurisdiction where suit "ar[o]se out of alleged tortious acts committed . . . in New York," even though appellee "accepted the terms of his employment while he was in Texas, took a physical and drug test in Texas, was paid via direct deposit to his Texas bank account, . . . once worked on a project in Galveston, Texas, and . . . received medical care in Texas after the incident"); *Wilco Farmers v. Carter*, 558 S.W.3d 197, 206 (Tex. App.—Texarkana 2018, no pet.) (same where "the operative facts of [appellees'] claims . . . concern[ed] principally whether [appellant's] employees exercised reasonable care in unloading the truck and whether [appellant] exercised reasonable care in training and supervising its employees, all of which took place in Oregon"); *Info. Servs. Grp., Inc. v. Rawlinson*, 302 S.W.3d 392, 404 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (same where "the majority of the focus of any trial would be directed to [appellee's] alleged wrongdoing in the U.K., not Texas"); *Primera Vista S.P.R. de R.L. v. Banca Serfin, S.A.*, 974 S.W.2d 918, 925 (Tex. App.—El Paso 1998, no pet.) (same where defendant deposited money in Texas but allegedly made misrepresentations to plaintiffs about that money in Mexico); *see also Elecs. Rsch., Inc. v. Reyna ex rel. J.M.A.*, No. 05-24-01097-CV, 2025 WL 2076021, at *5 (Tex. App.—Dallas July 23, 2025, pet. denied) (mem. op.) ("[E]ven if [appellant] has been registered to do business in Texas since 2005, and even if appellants have performed a significant amount of work in Texas, these facts have nothing to do with the operative facts of [appellee's] claims, which stem from a workplace accident in Indiana."). Therefore, the trial court erred by denying Vale's special appearance. *See Searcy*, 496 S.W.3d at 68; *Moki Mac*, 221

21

S.W.3d at 585. We sustain Vale's sole issue on appeal.

### III. CONCLUSION

The trial court's judgment is reversed. We render judgment granting Vale's special appearance and dismissing all claims against it for lack of personal jurisdiction.

YSMAEL D. FONSECA
Justice

Delivered and filed on the
11th day of June, 2026.